1. EXECUTORS—ACCOUNT—EXPENDITURES—BURDEN OF PROOF.
   Where, on the question of an executor's disbursements, it is proved that certain assets came into his possession, the burden of proof is on him to show that the disbursements were actually and properly made.

2. NOTES—FORGERIES—EVIDENCE—STANDARDS—OPINION.
   The signatures on the probated will, on a previous will of the deceased, and on five checks purported to be drawn by deceased, which were produced by a bank patronized by him, and charged to testator's account, are proper standards to be used by an expert in comparing alleged forged notes, in forming the opinion that the signatures to the notes were forgeries.

3. SAME—UNAUTHORIZED DISBURSEMENTS—EVIDENCE—REFEREE'S REPORT.
   The executors of an estate had allowed, and claimed to have paid, two notes, alleged to have been made and delivered by the testator to a person whose identity was established only by the evidence of the executors themselves and two other witnesses. He was not produced before the referee at a hearing lasting six months, nor was his absence explained. The testator's widow had never heard of him. No consideration for the notes, which bore interest, was shown, and at the time of their execution the testator held good interest-bearing demand paper. Payment was made before the expiration of the time for presenting claims, and the exact manner of payment did not appear. Experts testified that the signatures to the notes were forgeries. One of the executors had made an affidavit in a partition suit, six months before paying these notes, that testator was not indebted to any one. *Held* sufficient to support a finding of the referee disallowing the disbursement made by the executors in paying these notes.

4. REFEREE'S REPORT—PREJUDICE—SETTING ASIDE.
   Where a motion to set aside the report of a referee for prejudice was *not made until after the report was submitted to the court*, and the evidence is sufficient to support the findings therein contained, the report will not be set aside.

5. EVIDENCE—EXPERT'S OPINION—TEST.
   Where the signatures of two notes, when placed one over the other, and held to the light, were exactly the same in size, shape, and position

on the paper, and the lines coincided exactly, the opinion of an expert, founded on such a test, that the signatures are forgeries, is sufficient to support such a finding of the referee.

Proceeding to compel a judicial accounting by Herman Bolte, as surviving executor of the estate of Christian Koch, or Cook, deceased. On motions to confirm and vacate the referee's report. Report confirmed.

Louis Cohen, for contestant.
Henry M. Goldfogle, for accountant.

THOMAS, S. Christian Koch, who also sometimes used the name Christian Cook, died on February 1, 1893, and on May 4, 1893, his will was admitted to probate in this court, and letters testamentary thereon were issued to Herman Bolte and William Steencken, the executors therein named. The present proceeding was commenced against the executors to compel an accounting, and it progressed against both of them until after the referee had reported, and after a motion had been made and submitted to my predecessor, Surrogate Varnum, and after he had filed a memorandum to the effect that the report should be confirmed. Before any decree was entered on this decision, Mr. Steencken, one of the executors, died. A ruling of Surrogate Varnum, as to the effect of his death, has been passed upon by the appellate division of the supreme court, and, in due course, the application for a decree against the surviving executor, on the referee's report, has been argued at length and upon the merits before me. In order to pass upon this application, I have carefully read the entire record, including the elaborate briefs of counsel, and over 800 pages of stenographer's minutes, but I will confine this memorandum to a statement of the reasons for my conclusion as to one matter only, that being the only matter to which counsel for the surviving executor addressed his remarks, both in his oral argument and in his written brief. As to all other questions, I deem it sufficient to say that they were, in my opinion, correctly passed upon by the referee. It is substantially conceded that the amount with which the executors are charged by the referee came into their joint possession. The amount of assets shown by the inventory filed by them, being $8,758, is increased only in $169.31, and by interest, and nearly the whole of the controversy has concerned questions of allowances claimed by the executors for alleged disbursements. The amount charged by the report, as being the balance of the estate in the hands of the executors at its date, is $7,014. The main dispute was as to an item of $2,105, alleged by the executors to have been paid by them to one George Braun on November 27, 1893, being the amount said to have been due on two promissory notes signed by the testator, one for $1,500, dated July 1, 1892, payable on demand to the order of George Braun, with 4 per cent. interest, and the other for $500, dated November 1, 1892, payable on demand to the order of the same payee, with 5 per cent. interest. This claim of the executors is disallowed by the referee, who finds "that said paper writings were never delivered to the said George Braun by the decedent, and that said George

Braun never presented said paper writings as a claim against the estate of said testator, and said paper writings or claims were never paid by said executors, and said decedent was not indebted to said George Braun in any sum whatever."

The charge thus made against the executors is so serious that it is not to be passed upon, either for or against them, without most attentive consideration; but the learned counsel for the surviving executor is mistaken in his zealous contention that the burden of proof as to the issue involved rests upon the parties contesting the account. It is true that, in order to charge an executor with assets, it is necessary to establish affirmatively, by a fair preponderance of proof, that such assets came into his possession or under his control; but when assets are shown or admitted, and the executor asks for a credit because of a payment made by him, the burden rests upon him to show that the payment was actually and properly made. He acts as the representative and trustee of persons having a very limited control over him, and it is his legal duty, as well as his plain moral obligation, to furnish the owners of the funds disbursed by him with a full disclosure of all the facts and affirmative proof of actual and honest payment, which ought to be satisfactory to reasonable people. There are numerous circumstances connected with this alleged payment which are peculiar. In the first place, George Braun, the alleged creditor, was not produced before the referee, nor was his absence accounted for, nor was information furnished as to where he could be found, notwithstanding the fact that from the beginning of the hearing before the referee until its end, covering a period of six months, the suggestion was persistently made that the personage George Braun was entirely fictitious. It was, indeed, said by the surviving executor, in the course of his examination, that he had seen George Braun in the company of the testator, and he had been informed that he kept, or had kept, "a ladies' boarding house in Bayard street," and that he resided either at South Beach, Staten Island, or in New Jersey; but no more specific information concerning him was furnished, and, though the greatest diligence was used in following up each of these clews, the fact that George Braun ever existed is without proof, except by the testimony of the executors themselves, and of the son of the surviving executor, and of one other witness called by them, whose testimony will be commented on hereafter. The unwilling and qualified statements practically forced from the son of the surviving executor, that he had seen George Braun, are not at all convincing. The attorney, Rogers, who is said to have acted for Braun in collecting the claim, was not called. Another curious omission is found in the fact that no proof whatever was offered of the due consideration of the alleged notes. It was not shown that the testator received the amounts of the notes from George Braun or from any other person. He had an account in the Bowery Bank, and another in the East River Savings Bank. Both of these accounts were accessible to the executors, and it is not pretended that any entry in either of these accounts would fortify any allegation of the receipt of money by the testator which might tend to show a reason for giving the notes. It will also be observed that the

notes bear interest. And yet, at the time they were dated, the testator held demand obligations of the "Ph. & Wm. Ebling Brewing Co.," a perfectly solvent institution, in the sum of $8,500, held subject to his call, and bearing interest payable to him. It is entirely obvious that, before paying such notes, it was the duty of the executors to have learned what, if any, were the facts which led the testator to make such notes to the alleged proprietor of the "ladies' boarding house," and to communicate such knowledge to the owners of the money used in making such payment. No inquiry of this kind seems to have been made, and no delay appears to have been sought in order to make such inquiries, or to notify the parties in interest of this large claim, amounting to about one-fifth of the entire personalty which came into the hands of the executors. On the contrary, great diligence in making the payment affirmatively appears. The published notice requiring creditors to present claims limited the time for such presentation to December 5, 1893. Letters testamentary had only been issued in the preceding May, and this payment is claimed to have been made on November 27, 1893, before the expiration of the time prescribed for presenting claims, and only about six months after the issuance of letters. The affidavits purporting to be signed by Braun, and annexed to the notes, bear date November 2, 1893. It does not clearly appear just how payment was made to Braun. It certainly was not by check, although the money received by the executors was paid by the checks of the Ebling Brewing Company, and they had a bank account. It is claimed that the payment to Braun was made by Steencken, in the presence of the surviving executor, in bills which the surviving executor had kept for some time in a safe in his office. Just how long these bills had been in the safe, or what asset they had come from, is not satisfactorily shown. When the surviving executor was first cross-examined on this subject, he was quite sure that the bills had been on hand to make the payment for more than a month before the time payment was made. At a later meeting, when it may have occurred to him that preparation for payment should not have been made at a time earlier than the verification and presentation of the claim, he thought that the cash was obtained and set aside for this purpose at a later date.

A further circumstance bearing upon the question of the presentation of this claim and its payment is found in the fact that on March 14, 1895, the executor, Steencken, in the presence of the surviving executor, signed and verified an affidavit, entitled in an action to partition the real estate of the testator, to the effect that deponent "had known the said Christian Koch for more than twenty years before his death, and was well acquainted with his business, and knows that the said Christian Koch was not indebted to any person at the time of his death"; and, further, "that, after the death of said Christian Koch, this defendant, and the defendant Herman Bolte, as the executors of his last will and testament, duly advertised for claims against his estate, but that no claims have been presented, and that the time to present the same has expired." It will thus be seen that the entire claim rests practically upon the proposition of fact that the alleged debt is established by the writings of the testa-

tor. Testimony of experts in handwriting was given in opposition to the notes, and in rebuttal the executors offered the testimony of one Robert Rigsby as to their actual inception. This man testified, and, in this respect at least, with probable truth, that the body of the notes is in his handwriting. It is claimed that the executors did not know who had written the body of the notes, and the surviving executor explicitly declared such ignorance on April 16, 1896. It is stated, however, that he discovered that Rigsby was the person, while he was casually calling at the cigar store kept by Rigsby, with a friend. At this time photographs of the notes were laid upon Rigsby's counter, and he was asked to admire the results of modern photographic art. Thereupon Rigsby, in great surprise, declared that the notes were in his handwriting, and the executors discovered a valuable witness, whose examination was had on July 9, 1896. This series of coincidences was, doubtless, aided by the fact that Rigsby's cigar store was at No. 22 New Chambers street, while the office of the son of the surviving executor, and the place where claims were, by the published notice, required to be presented, was at No. 3 of the same street, and Rigsby was and had been for years a neighbor and acquaintance of the surviving executor. If the discovery of this witness is remarkable, his testimony was even more so. He stated that, at a date which he did not exactly fix, the testator came into his cigar store with George Braun, who was slightly known to him as a customer of the testator, and a person who did business in Bayard street. The testator produced two blank forms of notes, which had already been signed, and requested him to fill in the instruments, dating one July 1, 1892, and the other November 1, 1892. He did this, and gave the papers to the testator, who delivered them to Braun in his presence. He did not see the testator sign the notes. The peculiarity of this story scarcely requires comment.

This summary covers about all that can be found in the record of direct proof in support of the claim. No direct answer seemed available to the contestants. They could not find Braun at South Beach, where the executor had said that he resided, and "New Jersey" was quite indefinite as a place to search. The widow of the testator did not know of him, and had never heard of such a person. They then sought the aid of two handwriting experts, Messrs. Ames and Carvalho, both of whom pronounced the alleged notes forgeries. The exceptions pressed upon my attention by the counsel for the surviving executor mainly concern the admission by the referee of the testimony of Mr. Ames, it being contended that the standards used by Mr. Ames were not sufficiently proved to be genuine signatures of the testator. I do not think that these objections can prevail or be made a ground for directing a new trial. The will executed by the testator, and proved in this court, and a previous will, as to which the surviving executor was a witness, and proved by him to be genuine, were two of the standards. Five checks, produced by an employé of the Bowery Bank, purporting to be drawn by the testator on that bank, and the amounts of which had been deducted from his account, leaving a balance which the executor had approved as correct, by settling with the bank on the basis of its correctness, without any ob-

jection to any item of the account, were also used as standards by Mr. Ames. The objection to the testimony of Mr. Ames seems to me to be not to its admissibility, but to its weight. He expressed an opinion that the notes were not genuine, and was not interrogated as to the grounds of such opinion. Standing alone, this amounts to very little, if to anything whatever. I should not feel justified in making a finding of such a fact merely on the ground that a witness, even as respectable as Mr. Ames, was of opinion that it was true. I therefore reject the testimony of Mr. Ames in its entirety, and rule that it is as if stricken from the record. The testimony of Mr. Carvalho stands on a different ground. He reached the same conclusion as Mr. Ames, and pronounced the notes forgeries; but he told the referee the reason for his opinion, and in doing so pointed out a remarkable fact. If the two notes are placed one over the other, the sides and ends coinciding, and then the two are held to the light, it will be discovered that the two signatures "Christian Cook" on each are entirely and exactly alike. Each line of each of the thirteen letters is precisely similar in size, shape, and position on the paper with the corresponding line in the other note. There is not the slightest deviation, except such as might and naturally would occur if both signatures were tracings from the same standard. That an illiterate man, capable of writing his name, but not able to fill up the bodies of two notes, could, without tracing and painstaking design, produce two signatures so precisely alike, Mr. Carvalho deems incredible. The referee agreed with him, and so do I. The testimony of the pretended expert, Keene, who could not observe the similarity of the signatures, which is entirely obvious to me on inspection, does not impress my mind as being of weight. Taking the whole of the testimony together, I am not satisfied that the claim of George Braun, if such a person exists, was an honest or valid claim, or that it was honestly and in good faith paid. As a result, I concur in the decision made by my predecessor, Surrogate Varnum, and direct a decree confirming the report of the referee, and adjudging against the surviving executor the relief that he recommended against both executors. Commissions will be refused to the surviving executor, he will not be awarded costs or counsel fees out of the estate, and the entire costs of the proceeding will be adjudged against him. A motion to set aside the report of the referee, on voluminous affidavits, claimed to establish bias and improper behavior on his part, was argued before me at the time of the argument of the application to confirm the report. This motion was not made until after the referee had made his report. The executors waited until they had taken all of the chances of a favorable report, and undertook to disclose to the court the improprieties of the referee only when they discovered that his ruling was against them. This raises a strong presumption against the motion, if it is not a complete answer to it. The allegations made against the referee are denied, and if, in the progress of the hearing, he acquired a notion that the executors had not acted fairly, that was the natural result of the testimony given. The tactics of the counsel who appeared for the executor before the referee, as disclosed by the minutes, his persistent refusal to rest on his exceptions,

and his constant and aggravating interruptions and defiance of the just authority of the court, would explain, if they did not entirely excuse, much more of petulance than was displayed by the referee.

The motion is denied.