Hon. E. L. Fancher, Referee.
By the order of this court, made at special term, before Hon. Jony Sedgwick, Justice, on May 15, 1879, it was ordered “that the case be sent back to the referee for the giving of such further evidence in relation to said schedules” (A. and B., annexed to defendant’s affidavit), “by either party, as they may be advised; and that, after hearing such further evidence, said referee is to report his findings and conclusions thereon, with liberty to modify his former findings, if he "shall be advised that justice requires him to do so.” The further findings and conclusions accompany this opinion.
The further evidence thus offered before the referee on the part of the defendant, consists of the testimony of himself, and of eight witnesses produced and examined in his behalf; also of the two papers A. and B.
The defendant claims that, since the former trial, “in the pocket of a cast-off garment folded, and wholly concealed, he has discovered, a memorandum of direc *115 tions signed by the plaintiff, Hunt” (that is Schedule A.); also, that since the former trial he discovered, “ hidden behind a large safe, and amidst a mass of rubbish at his store, the original agreement as to the twelve houses ” (that is Schedule B.). Both are now presented on the part of the defendant, as genuine papers.
It is a circumstance worthy of remark that the two papers (Schedules A. and B.) were not, if genuine, found before, and produced on the trial of the issues in this action. The defendant cannot be supposed to have been ignorant of the importance of them. Another circumstance that arrests attention is the alleged finding of the papers in the manner and places as stated by the defendant. If it be possible the papers were thus found, the circumstances appearing and proved on this hearing are strongly against the defendant’s statements in that respect.
In the first place, Schedule B. consists of over eight pages; and each of the pages is smoked and discolored. The outside is not so much blackened as are the pages. Had the paper fallen behind a safe, as stated, the outside might have been discolored by the rubbish in which it is alleged the same was found, but each of the pages would not have borne the evidence of some intended or systematic smoking or discoloration.
In the next place, the alleged signatures of the plaintiff, Hunt, on Schedules A. and B., attract notice. They are perfectly traced facsimiles. They are not, what is commonly the case in genuine signatures, only alike in general character and resemblance, but they are more. They prove to be facsimile tracings, drawn one over the other, or over another signature. I think they were traced over the plaintiff’s signature to a receipt for $333.34, dated New York, November 3, 1873, which is among the exhibits in the case handed to» the referee.
*116 In Morey v. Safe Dep. Co. (34 Super. Ct. 157), it was said : “It may now be regarded as the law of this State, that for the purpose of showing the genuineness of a signature in controversy, it is inadmissible to compare it with signatures to other papers, unless those other papers are in evidence in the cause, and material to the issue, or perhaps admitted to be genuine ; and that the signatures in said other papers (except as above stated) cannot be submitted to the jury for their comparison with the disputed one” (Van Wyck v. McIntosh, 14 N. Y. 439, 442; Du Bois v. Baker, 30 Id. 362).
The same point was decided in Goodyear v. Vosburgh (63 Barb. 155).
As the agreement sought to be reformed, and other exhibits herein referred to, are in evidence for other purposes, they may be referred to by jury or referee, in order to test, by comparison, the genuineness of the alleged signatures to the Schedules A. and B.
It was said in Ellis v. People (21 How. Pr. 358), “ The rule in this State and in England is, that when different instruments are properly in evidence for other purposes, the handwriting of such instruments may be compared by the jury, and the genuineness or simulation of the handwriting in question be inferred by such comparison (Van Wyck v. McIntosh, 14 N. Y. 442 ; Dorr v. Newton, 5 A. & E. 514). A witness cannot, however, take the place and usurp the functions of the jury.” (See also Sackett v. Spencer, 29 Barb. 187.)
If, therefore, a jury could compare the signatures to the above-mentioned papers, 1 suppose it is proper for the referee to do so.
Such comparison shows, plainly, that the signatures to A. and B. have both been traced over another and the same signature. They are identical facsimiles. They correspond with the signature to the receipt above mentioned. No variation appears in the posi *117 tion, or size or formation of the letters, nor in the space or level occupied by the signatures. Held up to the light the signatures perfectly lap one another. That is not the fact in respect to the genuine signature on the original agreement sought to be reformed. The length of that signature is less by about a quarter of an inch. The signatures to A. and B. were not, therefore, painted or traced from the signature to that agreement, nor from any one of the admitted signatures, except said receipt; but they must have been traced from that receipt, or that receipt itself has also been traced from another signature. The alleged signatures on A. and B. are precisely the same in tracing and appearance. There is not the slightest variation in the painting or lines of a single letter. The downward curve of the pen after “t” (the last letter in the signature) is a little displaced, so that the curves in both simulations are not in precisely the same place; but that variation would be accounted for by a slight slip of the paper during the operation of tracing.
On page 248 of plaintiff’s evidence on the original héaring, he denies that he ever knowingly signed any such paper as Exhibit 9 ; and states that he never agreed to any of the provisions of that paper. The exhibit has brown paper pasted on the back of it, and the paste is daubed behind the signature, so that it is difficult to see the lines through a superposed signature. But a close examination shows that the signature to Exhibit 9 is identical with that to the above-named receipt and with those to Schedules A. and B. It would require a vast amount of credulity to suppose that those four signatures can all be genuine and yet all of them lap one over another so that the whole are identical. One of them is probably genuine, the others traced or, perhaps, all four are traced.
The signature to Exhibit 9 was attempted to be shown to be genuine by the witness Doody, page 227. *118 He testified that he keeps a lunch-stand, and was called in by the defendant to witness the paper. Lawless told him he should sign it as a witness, and he did so. He says Hunt was there and was talking with Lawless; but the witness did not see Hunt sign the paper, nor did Hunt request him to witness it, or acknowledge the signature. He does not, therefore, make sufficient proof that Hunt ever signed Exhibit 9.
Now, is it possible that the four disputed signatures are genuine? Did ever any man sign his name four • times with such invariable uniformity, in the ordinary course of writing his name? All experience testifies to the absurdity of the supposition that he did.
Among the exhibits used on the trial, and submitted to the referee, are several on which the signature of the plaintiff, Hunt, is proved or admitted to be genuine. They are as follows :
Three receipts, dated respectively February 3,1874, August 11,1875, and June 23, 1876.
Four checks, indorsed by Samuel J. Hunt, dated respectively November 3, 1873, May 13, 1875, November 2, 1875, and June 23, 1876.
Two letters, dated January 24, 1878, and May 22, 1877.
Agreement, dated May 26, 1877 (Ex. No. 6).
Agreement, dated November 1, 1877 (Ex. No. 3).
Agreement, dated November 3, 1877 (Ex. No. 4).
Here are twelve -genuine signatures of Hunt on those exhibits.
No one of the signatures to those papers laps over another, nor over the suspected signatures to Exhibit 9, and Schedules A. and B. The facsimile feature applies to the signatures to these last named three papers, and to the receipt of November 3, 1873; but does not apply to any of the signatures to the genuine papers above mentioned.'
If but two of the signatures were identical, and one *119 of them was disputed, the evidence of simulation would be very strong ; but where four are produced, all alike, as if lithographed, the claim that three of them are simulated is well supported.
It is a fact well known, and maybe readily verified, that no two signatures, actually written in the ordinary course of writing them, are precisely alike. The character of a person’s signature is generally of uniform appearance, and the resemblance between one and another signature of the same person is thus apparent. But the coincidence is seldom, if ever, known, where a genuine signature of a person, when held up to the window-pane, superposed over another genuine signature of the same person, is such a facsimile that the one is a perfect match to the other in every respect. It may be possible for an expert penman, intentionally, to make two signatures so much alike that one will' be a counterpart of the other; but the signatures made in ordinary transactions, written without such studied and careful intention, are never counterparts one of another. There is a diversity in the marks of the pen, the size of the letter, the level of the signature, and the space it occupies, that stands as a guard over the genuine signature, and characterizes it as a true signature. But where two or more supposed signatures are found to be counterparts, I think the simulation is detected by that circumstance. Genuine signatures will not lap with perfect similarity one over another.
In 4 American Law Review (1869-’70, 625), there is an interesting report of a case in the circuit court of the United States, 1st circuit (3 Cliff. 169). Upon the subject of the identity of two signatures, Professor Pierce, formerly of Harvard University, expressed an opinion. He said, “ This phenomenon (i. e., identity of two signatures) could occur only once in the number of times expressed by the 30 th power of five; or more exactly, it is once in 2,666,000,000,000,000,000,000. *120 This number far transcends human experience. So vast an improbability is practically an impossibility. Such evanescent shadows of improbability cannot belong to actual life. They are unimaginably less than those least things which the law cares for.
“ The coincidence which is presented to us in this case cannot, therefore, be reasonably regarded as having occurred in the ordinary course of signing a name. Under a solemn sense of the responsibility involved in the assertion, I declare that the coincidence which has here occurred must have had its origin in an intention to produce it.”
The case went off on another question, so that there was'not given to Professor Pierce’s opinion the force of judicial sanction (see Mandell v. Green, 108 Mass. 277 ; Robinson v. Mandell, 3 Cliff. U. S. Cir. Ct. 169).
The professor’s opinion cannot, therefore, be quoted as evidence or authority, and it is referred to only as a strong expression of an opinion, touching a fact everywhere known and observed, that signatures of the same person, written in the ordinary course, are not identical. If the coincidence of identity be observed in two or more of them, experience testifies there is an intentional simulation.
The plaintiff testifies that the papers marked Schedules A. and B. were never seen by him until produced by the defendant in this case, and that the signatures thereto are not his signatures.
I am constrained, in view of all the testimony, and of the facts appearing on this reference, to believe that the plaintiff has testified to the truth.
I do not regard the testimony of the eight witnesses for the defendant on this rehearing as .militating with much force against that view ; for all they have said can well be referred to what occurred between the plaintiff, Hunt, and the defendant, Lawless, at one of *121 tlíe interviews between October 23 and November 3 (see plain tiff’s testimony, p. 41, also defendant’s testimony, pp. 168 and 169), when the plaintiff objected to a deed proffered by the defendant, but desired another, as security for the rent due from the defendant. Deeds were then the subject of conversation, and the great question between Hunt and Lawless is, whether the former was to take, as security for the rent due, a deed of premises which he should, on payment of the rent, reconvey by a quit-claim ; or whether Hunt intended to make an absolute purchase, as claimed by the defendant, and was to have a deed accordingly.
In view of all the facts I am constrained to believe the statements of the plaintiff, Hunt, and to disbelieve those of the defendant; and 1 do not think the former findings in this case should be modified. On the contrary, the rehearing has convinced me that those findings are correct.