The application of petitioners is granted, with costs to be fixed in the order.

Application granted, with costs.

---

(43 Misc. Rep. 437.)

### In re BURTIS' WILL.

(Surrogate's Court, Cayuga County. April, 1904.)

1. WILLS—CONTEST—BURDEN OF PROOF.
   The burden is not on the contestants of a will to prove forgery to the exclusion of every other reasonable hypothesis, but, the burden of proving genuineness being on the proponent, probate must be refused if the surrogate is not satisfied that the signature is genuine.

2. SAME—SIGNATURE—PRESUMPTION.
   It cannot be presumed that testator signed the will from the fact that the body of the will is in his handwriting.

3. SAME—EXPERT TESTIMONY.
   The opinion of an expert witness as to handwriting is valuable only when it points out satisfactory reasons for the witness' conclusion.

4. SAME—EVIDENCE—SUFFICIENCY.
   On proceedings to probate a will, evidence considered, and *held* insufficient to show that the signature was genuine.

Proceedings to probate the will of Albert G. Burtis, deceased. Probate denied.

Teller & Hunt, for proponent.
Underwood, Storke & Seward, for contestants.

WOODIN, S. The death of Albert G. Burtis, late of the town of Fleming, of this county, which occurred in the spring of 1903, has been followed by litigation, in this proceeding for the probate of his alleged last will and testament, which I believe stands unique in the history of cases of like character, at least in this state, not only as to the intensity of the contest which has been waged, but also as to the peculiarity of the features and questions presented.

Mr. Burtis died the owner of a large estate, consisting of real and personal property approximating $250,000 in value. At the time of his death, and for a number of years prior thereto, he lived at his country home bordering on the shores of Owasco Lake and known as "Springside," and which, as the proof shows, has been the scene of many wine and dinner parties; and, while in some respects living a life of seclusion, yet he seemed to take pleasure in entertaining his friends and acquaintances on various occasions, and did so with lavish hand. The deceased was a widower, 59 years of age, and had no children, and his immediate relatives are Mr. Cary S. Burtis, his father, and Mr. Edwin C. Burtis, his brother, both residing in the city of Auburn, N. Y. The deceased lived at Springside with only his servants and such of his friends as he chose to have visit him. His entire attention seems to have been devoted to the gratifying of such pleasures and pastimes as his fancy dictated and his wealth permitted him to follow, and in later years and down to the time of his death he drank excessively, and the moral atmosphere in this and other respects at Springside was at low ebb. Strange stories are told of the doings and happenings at Springside during the last few years of his life. His cellars were stocked with wines, and Springside was the scene of bacchanalian revelry. An air of mystery surrounded the place; his servants having orders not to enter certain rooms, and at times to admit no one to the house. His bibulous habits frequently resulted in long sprees, and his death was doubtless hastened by these debauches.

The proponent in this proceeding, Miss Elizabeth C. Burgess, is a young woman about 22 years of age, sustaining no blood relation whatever to the deceased, and lives with her mother, Mrs. Sarah J. Bell, in the city of Auburn, N. Y. Shortly after Mr. Burtis' death, through her counsel, Miss Burgess presented a petition for the probate of an instrument in writing purporting to be a will of the deceased, in and by which she was made the sole beneficiary of the estate and property of Mr. Burtis, and appointed the sole executrix therein. The witnesses to the will are Mrs. Sarah J. Bell, the mother of the proponent, and Mr. John Marshall, who had the management of the decedent's farm property at Springside. The deceased's father and brother appeared by counsel upon the return of the citation issued in the proceeding, and the witnesses to the alleged will were cross-examined at great length. An answer to the petition for probate was

subsequently filed, containing the usual allegation of undue influence, incompetency, etc., and including the allegation that the signature to the will was a forgery. At first blush the allegation of forgery is a bold one, for the instrument is written upon the usual printed will form, and the writing, aside from the disputed signature and the names of the witnesses and their addresses, is conceded to be in the decedent's own handwriting, which fact makes the claim of forgery of the signature the more startling; and this, I believe, is one of the features in this case which distinguishes it from any of the reported cases.

The proponent vigorously contends that the signature is genuine, and stands broadly on the proposition that the circumstances in the case support her position, pointing chiefly to the fact that the body of the will is in the decedent's own handwriting; to the evidence tending to show that the decedent had great affection for her (in fact, that she was his fiancée); to the proof of testamentary declarations by the decedent in her favor; to the fact that, in harmony with this testamentary purpose, he had deposited securities in his safety deposit box inclosed in an envelope addressed to her; and to another instrument, dated October 23, 1901, in the decedent's handwriting, purporting to be a will in her favor, and which is witnessed by Mrs. Bell and Mrs. Helen B. Atkins, a sister of proponent, all of which, if unshaken, tend to make proponent's case strong.

The theory of the contestants is that both wills (the one offered for probate, and the earlier will of October 23, 1901), are the product of a conspiracy to acquire the Burtis estate, in which the proponent and her mother were the chief actors. It is claimed that the proponent, taking advantage of the close and peculiar intimacy in which she lived with the decedent for several years prior to his death, aided and inspired by her mother, as the prime instigator, prevailed upon the decedent to draw first the will of October 23, 1901, and afterward the will of May 26, 1902, while in a state of partial intoxication. Neither instrument, it is alleged, was ever executed by the decedent, but both were obtained by proponent, and fraudulently completed into the semblance of valid wills, the one by a fictitious attestation by subscribing witnesses, and the other by a forgery of decedent's signature.

Considerable proof has been introduced bearing upon the relations existing between proponent and decedent. It appears that proponent became acquainted with the decedent in 1897, and from that time down to his death stood in very close relations with him, and spent much of her time at Springside. The claim that decedent desired to marry proponent is evidently deemed by her to be important, as bearing upon the decedent's intentions in the disposal of his property, and upon this point I have examined the evidence carefully. We have Mrs. Bell's testimony that the decedent in 1900 asked her permission to marry the proponent; that she refused, giving as her reason that her daughter was too young; that this request was again made by decedent in 1901, and again refused for the same reason, and finally, in 1903, she gave her consent; and that the decedent and proponent were engaged to be married at the time of his death. There is also

evidence that the decedent expressed his desire to marry proponent to Mr. Atkins, proponent's brother-in-law. In connection with this testimony, it is necessary also to consider the character of the relations existing between decedent and proponent. Witnesses have testified as to the coming and going, the manner of life at Springside and elsewhere, the persistent keeping of the proponent by the decedent in the background, concealed from his friends and visitors at Springside, instead of being the object of respectful social attention, as ordinarily would be expected to be the case; and, to further insure the concealment of her identity, it appears that she adopted male attire at times, at any rate while at Springside. While at Mt. Clemens with the decedent she was introduced as his daughter, and as such was entertained in the Meyer household, and known as his daughter at the hotel where they stopped. It has seemed to me that the manner and character of these relations tend to negative, and in fact are entirely repugnant to, the claim that decedent desired or intended to marry proponent. There is not a single bit of written evidence tending to give credence to that theory—not even the briefest note written by the decedent to proponent indicating his desires in this respect—and it is fair to assume that no such writings exist, else they would have appeared in evidence. Another and even stronger circumstance inconsistent with the claim that decedent desired to marry proponent is the testimony of Mrs. Bell, the mother of proponent, that she twice refused to give decedent her permission to marry her daughter on the ground that her daughter was too young. A conclusion that such was the case is certainly doing violence to a rational idea of the fitness of things. If proponent was too young to marry, it would seem as though she were altogether too young to spend days and weeks at a time at Springside under conditions which could not help but make offer of honorable marriage welcome, and this with her mother's full knowledge and consent. I repeat, it seems improbable to me that two offers of marriage should have been made by the decedent, and rejected by Mrs. Bell on the ground that proponent was too young, as her objection becomes a mere travesty, in view of the relations existing with her knowledge and consent; and the inference is irresistible that the mother's indorsement of the course of affairs was prompted by some ulterior object rather than by mere indifference.

The contestants depend largely upon their evidence bearing upon the question of handwriting in support of their case, and it is evidence of this character which makes up a large part of the testimony.

Much has been said and written concerning the value of expert evidence, and there is a disposition to belittle the utility of evidence of this character. Of course, in cases where the handwriting or signature of a person, since deceased, is attacked as a forgery, the party defending it is apt to ridicule the value of expert evidence, because almost invariably evidence of this character is the only kind available to the party attacking the signature. He often has no other means at hand to show to the court or jury that the signature may be or is a forgery, while, on the other hand, the party defending the signature usually has the aid of one or more witnesses to testify to the fact of

the signing, etc. If the court were to adopt the view that expert evidence is of little value and disregard it, the party attacking the signature ordinarily would have but little chance of success, and it would create unlimited opportunities for designing persons to forge the name of deceased persons to important documents and then swear it through. The court or jury should not ignore this class of evidence, but should examine it as carefully as any other in the case, as it may be that by that evidence the court is able to reach a satisfactory conclusion. It is urged that we will find as many experts testifying upon one side as upon the other. That may be true, and it is also true that we will find as many lay witnesses upon each side in litigated cases, giving different versions concerning a fact or circumstance. But this does not signify that the evidence of those witnesses must be disregarded because they disagree. Nor is it important specially which side has the greater number of expert or lay witnesses sworn in his behalf. It is the nature or character of the testimony given by the witness which is important. In the case of expert witnesses, their opinions are valuable only in so far as they point out satisfactory reasons for the ultimate conclusion of the witness. If the witness simply testifies that he believes the signature genuine, or not genuine, as the case may be, and gives no reasons for reaching his conclusion, his opinion is valueless, and the court will not consider it. If he gives reasons for his opinion, then it is the duty of the court to examine into and analyze those reasons, and determine the correctness or incorrectness of the opinion, and not simply consider the conclusion of the witness alone. It might perhaps be expected that the court, in coming to a conclusion in a case of this character, would first inquire into the facts and circumstances outside of the evidence involving an examination of the handwriting, and endeavor to ascertain whether the circumstances, in connection with the history of the will propounded, its alleged execution, etc., were free from suspicion, or not, and then regulate in accordance therewith the degree of weight to be given to that part of the evidence bearing upon the question of forgery. In other words, that the question of forgery should be secondarily considered in connection with the other facts in the case.

In the case at bar, however, there stands out a piece of evidence which proponent must explain, if possible, before probate is granted, and which at once demands an equal, if not greater, consideration of the evidence bearing upon the question of forgery. I refer to the physical evidence furnished by the disputed signature itself. A mere inspection of this signature will satisfy the most careless observer that it needs an explanation, and, when the signature is analyzed and the proper tests applied, this explanation becomes imperative. In this connection it may be proper to consider proponent's claim that the contestants have the burden of proving forgery to the exclusion of every other reasonable hypothesis before it can be held by the court to be established, claiming that the same rule applies in this case as in a criminal prosecution of a person for the crime of forgery. I believe the rule to be otherwise, at any rate in probate cases, and that throughout the trial the proponent must sustain the burden of proving all the essential requirements. Even though the issue of forgery

is not raised, the proponent must nevertheless prove that the de-. cedent signed the instrument propounded, and the rule is not different where the issue of forgery is involved. Howland v. Taylor, 53 N. Y. 627.

In the Parish Will Case, 25 N. Y. 9, the court quotes from the opinion of Lord Brougham in the case of Panton v. Williams, 2 Curt. Ecc. 530. In the English case the will was contested on the ground of forgery. The Prerogative Court admitted the will to probate "with great doubt and difficulty," because, as the court said, the witnesses were "consistent throughout and adhered to the story originally told." On appeal this decision was reversed, where it was said that the mind of the court must not be left in doubt, that no duty was cast on the court to strain after probate, that inconsistencies in contestant's case were much less material than inconsistencies in the proponent's case, and that grave suspicion rested upon the material parts of the case. In the Parish Will Case, the court further says at page 34:

"It seems to us that these cases fully establish the following propositions: (1) That in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in question does declare the will of the deceased, and that the supposed testator was, at the time of making and publishing the document propounded as his will, of sound and disposing mind and memory. (2) That this burden is not shifted during the progress of the trial, and is not removed by proof of the factum of the will. * * * (3) That if, upon a careful and accurate consideration of all the evidence on both sides, the conscience of the court is not judicially satisfied that the paper in question does contain the last will of the deceased, the court is bound to pronounce its opinion that the instrument is not entitled to probate. * * * (5) That it is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved, and great difficulties oppose themselves to so doing. (6) That the heirs of a deceased person can rest securely upon the statutes of descent and distributions, and that the rights thus secured to them can only be divested by those claiming under a will, and in hostility to them, by showing that the will was executed with the formalities required by law, and by a testator possessing a sound and disposing mind and memory."

This doctrine was again applied in Tarrant v. Ware, 25 N. Y. 425, note.

The fact that the body of the will is in the decedent's own handwriting affords no presumption that he signed the will. The Legislature has thrown such safeguards around making and executing a will, that, no matter what may have been the early English rule, it is now required that the testator shall subscribe his name in the presence of at least two witnesses, or acknowledge the signature to them, and the proponent must prove this fact, even though the instrument is all in the testator's own handwriting. The fact that the body of the will is in the decedent's handwriting is useful in several respects, after the due execution of the will is established, but it is not proof in any way of due execution.

Turning now to the disputed signature, we find on inspection that it is quite unlike the decedent's usual style of writing. It is admitted by most of proponent's own witnesses that the signature is unusual. As already stated, the body of the will, including the decedent's name, near the top, is in his own usual free, rapid, and easy style of writing, while the disputed signature has a heavy, labored, wavering appear-

ance, as though carefully and slowly written, and, as many of the proponent's witnesses have said, requires an explanation. The signature, on its face, independent of any other consideration, is, without any question, suspicious. Even when considering this signature in the most favorable light, in connection with the other evidence in the case tending to show that the decedent intended to make testamentary provision for the proponent, it nevertheless stands out as a silent, emphatic denial of genuineness. A person may write poorly at times, when his signature does not resemble his usual style of writing, perhaps; but there is a built-up, mechanical appearance of this disputed signature which even a most liberal consideration cannot disregard. The suggestion offered by proponent, that men, in signing important documents, like a will, etc., are apt to use more care in signing their names, has no application whatever to the decedent's habit in this regard, for we find that his signatures to the will of October 23, 1901, and a still earlier will in favor of his cousin Mrs. Scott, are written in his usual bold, rapid, and easy style.

A vast amount of expert evidence has been adduced in this case bearing upon the disputed signature. The signature has been subjected to a most searching examination and analysis by witnesses called for that purpose. All of the tests known in this line of investigation have been applied, and an exhaustive exposition of every feature of the signature, however minute or apparently insignificant, has been submitted to the court. An injustice might, perhaps, be done to predicate a forgery upon this class of evidence alone; and in this connection I have, with careful attention, read the opinion of the learned surrogate of New York county in the Taylor Will Case, 10 Abb. Prac. (N. S.) 300, discussing the value of evidence of this character. But there appears in the case at bar a silent, convincing piece of evidence, furnished by the will itself, which, independently of the expert evidence, establishes beyond any reasonable doubt that the signature to the will propounded was not written by the decedent. I refer to the startling physical evidence which is disclosed when the disputed signature and the genuine signature at the top of the will are superimposed. Upon a careful inspection of these two signatures, it will be found that they coincide almost exactly—in other words, if we place the disputed signature over the genuine signature, near the top of the will, and hold them up to the light, it is difficult to locate any of the genuine signature underneath, for the reason that they superimpose with such remarkable exactitude. True, there are slight departures occasionally from the model, but these variations are only in the detail of certain lines; the whole of the disputed signature being structurally the same as the other, and occupying the same physical field. Indeed, it may fairly be said that these very departures tend to indicate the process which has produced the signature, for it will be noticed that after each departure the line of the disputed signature immediately returns to the line of the model; showing conclusively, as I think, that there was a model which was steadily operating as a guide to the writer's hand. This coincidence of a disputed signature with a genuine one when superimposed against the light has long been held by the courts to be proof of simulation. As

the Appellate Division of the Supreme Court says in the Rice Will Case, it does not need the testimony of experts to demonstrate that the disputed signature is a tracing from the genuine.

The Rice will was contested in the New York County Surrogate's Court on the ground of forgery. The name of the decedent, William Rice, had been signed at the bottom of each of the four pages, and the will was denied probate on the ground that the signatures were tracings from an original. The Appellate Division, in sustaining the decision of the surrogate, comments upon the evidence on this point as follows:

"It may not, however, be out of place to call attention to one piece of evidence bearing on this subject. The name of William M. Rice appears four times upon the alleged will of 1900, and, upon a critical examination of these four signatures, it will be found that they correspond almost exactly—a coincidence which could not possibly happen in the case of four genuine signatures of a person upward of eighty years of age—and for this reason does not need the testimony of experts to demonstrate that these signatures were not genuine, but tracings. The resemblance in each is so striking that it cannot help but be observed upon a bare inspection, and, if a measurement be made from any given point in one, it will be found to correspond to the merest fraction of an inch in the other; in other words, each signature will superimpose the other—a similarity which does not appear in the concededly genuine signatures introduced in evidence, and which, from the very nature of things, could not occur. This fact, taken in connection with the other evidence bearing upon the same subject, is of such a character as to irresistibly lead to the conclusion that, had the testimony which was stricken out remained in, the surrogate's conclusion would have been the same, and therefore the error was entirely immaterial, and could not by any possibility have injured the appellant." Matter of Rice, 81 App. Div. 223, 81 N. Y. Supp. 68.

The same rule is applied in cases where the coincidence is between a single signature and the model from which it was drawn. Hunt v. Lawless, 7 Abb. N. C. 113, affirmed 47 N. Y. Super. Ct. 540; Abb. Tr. Brief (2d Ed.) 406; Rog. Exp. Test. (2d Ed.) 292; Matter of Koch (Sur.) 68 N. Y. Supp. 375.

Such a doctrine is not at all unreasonable. On the contrary, it is strictly in conformity with human experience. It is a common occurrence in the speech of people to hear the expression that "nobody ever writes twice alike." And that belief has become so well established that, when we find a genuine signature which coincides with the disputed signature, there is but one inference to be drawn, namely, that the one is a tracing from the other. In the Rice Case the court did not have before it the original model from which the signatures were traced, and came to the conclusion that the four signatures were traced from some unknown genuine signature from the fact that they all practically coincided. In the case at bar, however, we have the model before us—the genuine signature near the top of the will. We have, therefore, in the case at bar, a surer test of the method of production than existed in the Rice Case. With both the model and the copy before us, we can, by simply comparing the two, follow each stage in the process, and determine with practical certainty whether one has been traced from the other.

Another point, also apparent from inspection, and which is strongly suggestive in this connection, is the fact that the signature has the appearance of being tilted up to the left, as though made from a copy

which was not laid straight on the printed line. In other words, the signature starts in at a point somewhat above the printed line, and then follows an imaginary line which gradually approaches the printed line until they meet at or near the end of the signature.

Coupled with this physical evidence furnished by the will itself is the significant fact that 15 out of 17 friends and acquaintances of the decedent, who were familiar with his handwriting, and who were called as witnesses on both sides, have testified that they believed the signature a forgery. These witnesses include the various bank officers where decedent was a depositor, his personal counsel and real estate representatives in New York City, and his personal friends and acquaintances who had been his correspondents. The evidence of this class of witnesses is ordinarily more convincing than the other opinion evidence in the case. These witnesses testified from a knowledge acquired by familiarity with the decedent's handwriting, and therefore stand on a different footing from the expert witnesses.

The evidence offered by proponent in defense of the signature does not overcome or explain this convincing proof of simulation. Indeed, it may be said of that evidence, as a whole, that it contains much that is confirmatory of the contestants' theory. Every one of proponent's professional experts has, I believe, used language indicating that he found difficulties in the signature, while counsel himself felt constrained to admit in his opening that it was not claimed that the signature is free from peculiarities that attract attention and may be suspicious.

Proponent's expert Mann said that at first examination the signature seemed to him "doubtful and suspicious." Proponent's expert Amsden, when first consulted, noticed "a sort of wavering" in the signature, and asked if it had been written upon a rough surface. This witness asked to be excused from giving his reasons for his opinion that the signature was genuine. Proponent's expert Rathbun could only account for the "trembly" character of the signature upon the theory of its having been written on a rough surface. Proponent's expert Frazer finally came to the conclusion that the signature was genuine, but added, "I must say, to be perfectly frank, that I was astonished that I did come to it."

Proponent's expert Hamilton devoted several months to the examination of the unusual features in the signature, before reaching an explanation of them satisfactory to himself. He finally settled down upon the theory, and attempted to prove in explanation of the unnatural appearance and quality of the signature, that it was impossible to produce it, except with a particular pen (found in the Bell household), having one broken nib, moving slowly, at a specified angle, over a surface having the precise number of corrugations appearing upon a certain book cover (also produced from the Bell household), and by the use of an impure and viscid ink (similar to an ink found in the same house).

In passing, I may say that the Hamilton theory of the production of the signature does not seem to me natural or reasonable. I think an inspection of the signature disproves the theory of a pen with a broken nib, as the tracks made by the separate nibs are both plainly

visible in many of the downward strokes. If all the lines running in the same direction in the disputed signature contained wavers of the same size and character, there would be more reason in the suggestion that the name was written over a book with a corrugated cover; but there appear wavers in certain lines which may, perhaps, correspond in measurement to the book corrugations, while in other lines, running in exactly the same direction, and indicating the same weight of stroke, such wavers are either entirely absent or are of different proportions.

Other features of Hamilton's testimony will be referred to later. I have mentioned his general theory at this point merely to show that to him, as to his associate experts, the signature has presented serious difficulties, and that in his case an explanation of these difficulties has been a peculiarly laborious, and, as it seems to me, unsatisfactory, process.

The testimony of the bank clerks and officials who are unfamiliar with decedent's handwriting, called by proponent to testify to the genuineness of the signature, is of little or no value. Their testimony consists practically of a bare expression of opinion, and no more. As before observed, the opinion of witnesses testifying as experts, unless supported by intelligent reasons, is of little weight.

Proponent has also put in evidence the results of an investigation and search, by her leading expert, through about 1,400 genuine signatures of the decedent, in evidence, for features in those genuine signatures which are similar to features appearing in the disputed signature, with a view of showing that the disputed signature contains the usual number of decedent's handwriting characteristics. The result of this work has been classified under different headings, and appears in the shape of a great mass of figures, tables, charts, etc., the purport of which is to show that the disputed signature contains more features or characteristics of the decedent than any other signature he ever wrote. I cannot see that this method of investigation is of the slightest value. If the signature is a forgery, it must go without saying that it will be very apt to contain many features which resemble closely the decedent's habits of writing, because the forger is endeavoring to simulate as nearly as possible the decedent's genuine handwriting; and it would be strange, indeed, if he did not successfully produce many of the decedent's characteristics, depending more or less, of course, upon his skill. These tables and charts, pointing out the instances in which certain features in the disputed signature correspond with features in the genuine, are useful only in determining that the copyist was more or less skillful, and this must be specially true in a case of tracing. Moreover, these tables are shown to be so inaccurate, both in classification of features and in mathematical computation, that they would be an unreliable guide even if the theory upon which they were based were correct.

The serration theory, also advanced by proponent, is a method of assuming to identify a person's handwriting by the number of minute abrasions, called "serrations," which appear on the edges of the lines. This theory is of such doubtful utility that even its author has not full confidence in it, and it needs no extended discussion.

In the body of the will appear the words "I give," interlined in the decedent's handwriting; and proponent has shown that these two words, the disputed signature, and the signatures of the witnesses, Sarah J. Bell and John Marshall, are written with the same kind of ink, namely, logwood ink, while the rest of the will is written with another kind of ink, called "iron ink." It is urged that, inasmuch as these interlined words, "I give," concededly in decedent's handwriting, and the disputed signature, are all in the same kind of ink, and different from the body of the will, the inference is that the decedent wrote this interlineation while at Mrs. Bell's house, where it is claimed the will was signed by decedent and subscribed by the witnesses, and, the disputed signature being written with the same kind of ink, that the further inference would follow that he wrote that signature. There would be force to this suggestion, perhaps, if it were not for the fact that the interlined words, "I give," are plainly in the decedent's handwriting, in his usual free, careless style, and are free from the halting, wavering lines that appear in the disputed signature, and are lighter and finer than the lines in the disputed signature. It appears improbable that the same hand wrote the two writings, their difference in quality and character being apparent upon inspection. It also appears that decedent had both kinds of ink at his house. Mrs. Bell also testified that the will was all drawn and filled in when it is alleged the decedent came to her house to execute it. There is therefore nothing in the evidence to support proponent's theory regarding the interlined words.

Upon the evidence thus far considered, I see no escape from the conclusion that the disputed signature is a forgery. As to the method of its production, I am of the opinion that it was copied, by the process of double tracing, or tracing one point removed, from the name at the top of the will. In this process a copy of the genuine writing is first made, and from that copy the forged signature is traced. This is the only available method of tracing where the model and the forgery are to appear on the same page in the position they occupy here. I have already referred to the fact that the left end of the disputed signature is tilted up from the printed line, as though the copy had not been laid straight under the paper or had slipped after being placed in position. This and the slight variances in detail from the model are easily accounted for by the difficulties of the method of tracing employed, if not by the lack of skill of the operator.

The coincidence between the two signatures in all matters of substance is well shown in the composite photograph, Exhibit 177, and is nowhere denied. Indeed, proponent has herself given in evidence a series of measurements which satisfactorily prove the identity of the two signatures. On the other hand, it clearly appears that nothing approaching this identity is to be found in any two genuine signatures of the decedent in evidence. The significance of this identity as evidence of tracing has been pointed out by the contestant's experts, although, as I read the opinions in the Rice and Hunt Cases, supra, and as common sense suggests, such evidence does not need the evidence of experts to explain it, and, if the identity exists, courts have uniformly held it to be evidence of forgery. Whether in a given case

it does or does not exist is usually a fact ascertainable by the court
or jury from mere inspection and comparison.

After reaching the conclusion that the signature to the will offered
for probate was not made or authorized by the decedent, the discus-
sion might naturally end here, but for the fact that this will is closely
connected by the evidence with an earlier paper, described as the will
of October 23, 1901, the history of which, because of that connection,
it now becomes necessary to examine. This earlier will has been
pressed upon my attention by both sides. The proponent relies upon
it to show testamentary intent. The contestants point to it as evi-
dence of conspiracy, in view of the circumstances leading up to and
surrounding its production. Like the will offered for probate, it pur-
ports to give the entire estate to the proponent. It is in decedent's
handwriting, was confessedly signed by him, and the names of Sarah
J. Bell and Helen Burgess Atkins, proponent's mother and sister, ap-
pear upon it as witnesses. If the paper is what it purports to be, it
is strong evidence in support of the proponent's case. If it is not gen-
uine, it is an important link in the chain of evidence sustaining the
contestants' theory of a conspiracy to obtain decedent's property.

It appears, without dispute, that during the last six years of de-
cedent's life the proponent made frequent visits to Springside, where
she often remained for weeks at a time. It appears that she frequent-
ly went back and forth at night or early in the morning, ordinarily
on a bicycle or on foot. She was not introduced to the decedent's
other guests at Springside, but remained in seclusion in the upper
rooms of the house. In order to better conceal her identity, it ap-
pears that she frequently wore male attire; and the servants, except-
ing, perhaps, Edward Nino, were not permitted to enter her rooms.
After a time she began to assist decedent in his correspondence, and
in other matters requiring clerical assistance. The decedent ap-
parently became very fond of her, and it would seem that she gradu-
ally acquired considerable influence over him. He was liberal in pro-
viding for her support and education in various ways. There is also
much evidence of the purpose on his part to make substantial pecuni-
ary provision for her in some form, although I think he was opposed
to making that provision by will. It is quite clear that the propo-
nent's visits at Springside were known to her mother, and that they
met with no objection or criticism from her. In fact, Mrs. Bell testi-
fied that she herself visited Springside upon several occasions on her
daughter's invitation. From these visits, if from no other source, the
conditions existing at Springside were made known to proponent's
mother. She must also have known of her daughter's four months'
visit to Mt. Clemens in decedent's company during the winter of
1900–1901, already referred to.

It also appears, without dispute, that the proponent's relation to
decedent, and the disposition to be made by him of his property, were,
from an early date, subjects of discussion between the proponent and
her mother, and that this question was a matter of apparent concern
to the proponent and her mother; there being numerous instances
related in which this subject was discussed by them. As late as Oc-
tober, 1902, five months after the date of the will offered for probate,

Edward Nino testified that the proponent asked him if the decedent intended to leave his property to Mrs. Scott. Finally, in May, 1903, after the death of the decedent, and before his funeral, the proponent, acting under her mother's advice, went to Mrs. Scott and demanded of her a package of securities which she and her mother apparently understood had been left for her by the decedent among his papers, to which it was assumed Mrs. Scott would have access—a course which would be unlikely if the proponent already had in her possession a valid will giving her the entire estate. None of these conversations or transactions showing the attitude of the proponent and her mother toward the decedent is denied, and, in view of this, I see no reason to doubt either the fact of their occurrence, or the purpose which they disclose, tending to corroborate the contestants' theory, and indicating an entire indifference, particularly on the part of proponent's mother, to the reproach and injury which the daughter was bound to suffer in execution of this purpose.

On October 23, 1901, the date of the first will, proponent's visits to Springside had continued upward of four years. It appears that various promises of gifts had been made to her by decedent, but nothing very tangible had been done to make them effective. The package of securities already referred to, although apparently marked with her name some time during the year 1900, remained in decedent's possession and under his control. Mrs. Scott was still decedent's sole legatee under the will of August 26, 1899. A few days prior to October 23, 1901, decedent wrote to proponent, asking her to come to Springside, and referred to some jewelry in his safe as an inducement to her to come. She came, and found the decedent starting on one of his sprees. It appears that she complained of it to Edward Nino, saying that she did not come back to nurse the decedent; that "he would have awful sickness, so she would have to take care of him."

The testimony of Edward Nino, if true, gives the history of the origin and production of the alleged will of October 23, 1901. He testified that on the evening of October 23, 1901, the decedent, proponent, and himself were alone in the decedent's apartments at Springside; that the decedent had been drinking, and that he "felt so good in a frolic"; that he called to Nino to bring a lamp to his table, saying, "I only live another night, and I want to write a few lines"; that the decedent took a pad of paper from the drawer, and drew up and signed the paper described as the will of October 23, 1901; that no other person was present during the evening, and no one signed the paper as a witness at that time. This was between 9 and 10 o'clock. Nino further testified that soon after the paper was finished he undressed the decedent and put him to bed, and that the paper was left lying on the table, and that it was gone in the morning. He also testified that he never saw it again until it was shown him upon the witness stand at the trial, when he identified it as the paper drawn on that occasion. This instrument, when produced at the trial, bore the names of Sarah J. Bell and Helen Burgess Atkins, written under the word "Witnesses." This evidence of Nino on this point is corroborated in several ways: First, it is evident that the decedent was on one of his sprees on that occasion, for a few days later, on October 29th, he collapsed

physically, as the result of his continued drinking, and Dr. Brown was called to attend him; secondly, the paper itself, aside from the names of the witnesses, is in conformity with the description given by Nino of the paper drawn at Springside on the night of October 23d. It is also conceded that the paper has been in the possession of proponent ever since its date. The two witnesses testified that on that night, "after dark," the decedent came to the Bell house, and that they there witnessed the paper in the presence of the decedent and of proponent. Mrs. Bell testified that the paper was all drawn, but the signature, when the decedent brought it to the house, and that he signed it there in her presence. I may say further, in passing, that I think the paper itself convicts the witness of error upon this point. It is quite obvious that so much of the paper as is in the decedent's handwriting, including the signature and the word "Witnesses," was all written in one ink and at one sitting. It is equally apparent, I think, that the names of the witnesses were written in a different ink. In this respect, as already noticed, the paper itself corroborates the testimony of Nino that the entire writing, excepting the witnesses' names, was done at one time and place. That this place was Springside, and not in the Bell house, is indicated both by Mrs. Bell's own testimony, and by the word "Springside" written at the top of the page.

But beyond all this, I am constrained to believe that the evidence further shows that Helen Atkins, the other witness to this paper, was not in Auburn at or near the date of its alleged execution, but was then in Chicago, where she was living with her husband and infant child. The evidence upon this point is voluminous and conflicting, but, I believe, if carefully examined, will remove any doubt as to the truth in the matter. It is conceded that Mrs. Atkins, who was married in June, 1900, went to Chicago to live about September, 1, 1901, and that, from October 19th of that year until some time in April, 1902, her home was in the Wadeford Apartment House, at No. 15 Elaine place in that city. It is also conceded that in April, 1902, she returned to Auburn, where she remained several months at her mother's house. In addition to this visit, she testified that she came to Auburn about October 22, 1901, with her infant child, returning about October 28th. It was during this visit, she testified, that the first will was witnessed. A number of witnesses have testified that they saw Mrs. Atkins in Auburn at or about the time in question. Most of these witnesses, I believe, gave their testimony in good faith; but the evidence as a whole, including some very significant proof furnished by Mrs. Atkins and her husband, convinces me that she could not have been in Auburn then, and that these witnesses have made the not uncommon mistake of endeavoring to fix the date of a past event without accurate data. It is easier to explain how such witnesses, in trying to fix the date of a casual meeting with an acquaintance, occurring 18 months to 3 years before the trial, might honestly confuse October, 1901, with October, 1900, or with April, 1902, than it is to escape certain definite and precise evidence, oral and documentary, which locates Mrs. Atkins in Chicago at the time in question. This evidence comes from four independent sources, and is of such character as to force conviction of

the truth in the matter.    First. Mrs. Smith, widow of the Atkins' Chicago physician, who produced her husband's visiting list, showing almost daily visits to the Atkins family at their rooms in the Wadeford Flats during the time Mrs. Atkins claimed to be in Auburn with her infant child, and testified that she personally drove with her husband on some visits, and that she was present when David F. Atkins settled the account for them.    Second. Mrs. McDonald, occupant of a neighboring flat in the Wadeford building, who became acquainted with Mrs. Atkins soon after she moved in on October 19th, testified that she saw Mrs. Atkins almost daily until the following April; knew that Mrs. Atkins' baby was very ill, and that the doctor was making frequent visits during the disputed period.    Third. Bessie Hancock, a young woman, maid to Mrs. McDonald, who stayed with Mrs. Atkins on two successive nights in October, 1901, when Mr. Atkins was on a business trip to Nebraska City, and who testified that the rooms were still in confusion from the recent moving, and that the child was so ill that Mrs. Atkins was up with him during most of the night.    Fourth. Admissions by both Mr. and Mrs. Atkins that the child was so ill in October, 1901, that Dr. Smith made "three or four" visits to him between October 19th, when they moved into the flat, and October 21st, the date of Mrs. Atkins' alleged departure for Auburn, and that Mrs. McDonald's maid did stay two successive nights with Mrs. Atkins soon after they moved into the flat, while her husband was away on business. Other testimony given by the Atkinses points to the fact, I think, that the time when the maid stayed with Mrs. Atkins was while Mr. Atkins was gone to Nebraska City.    It is conceded that this trip involved the nights of October 24th and 25th, and it would seem that Mrs. Atkins is conclusively shown to have been in Chicago in attendance upon her sick child on two of the nights when she claims to have been in Auburn.    In the evidence furnished by the Atkinses should also be noticed certain entries in the expense account of David F. Atkins. Some of these entries plainly show that they have been written over erasures, and while this may not be conclusive, or might, perhaps, be explained, nevertheless no satisfactory explanation was given; and there are other entries which show the purchase of articles, including medicine and household articles, tending to confirm the theory of the child's illness and of Mrs. Atkins' presence in Chicago on the dates named—a conclusion which I feel constrained to reach. ·

If Mrs. Atkins was in Chicago, and the decedent and proponent at Springside, on October 23, 1901, of course the testimony of Mrs. Bell and Mrs. Atkins concerning the execution of the will of that date at the Bell house cannot be true; and the presence of the paper itself in the case, instead of being evidence of the testator's purpose, inveighs strongly against the proponent's case.    If this conclusion is correct, its importance to the history of the case cannot be misunderstood.    It stamps the motives and conduct of the parties most interested in the will offered for probate, and prepares the mind for the conclusion, already reached by an independent process, that the signature to that instrument is a forgery.    It tends to explain the origin of that instrument without intent to execute it on the part of

the decedent, while the mere existence of the second will would signify that the decedent did not deem or consider that the first will was in force or effect.

Assuming the honest execution of the will of October 23, 1901, there was no reason for making or even drafting the will of May 26, 1902. According to proponent's theory, the existence of the .earlier will was known to her, and the will itself was in her possession. The two .instruments are precisely identical in legal effect. They are dated only six months apart. If the first one was valid, there was no occasion for the second, and it is hardly probable either that the proponent should have suggested, or that the decedent should have drafted the second will if the first had been actually and honestly executed.

With the knowledge of the type of man decedent was, it is not necessary to determine whether or not he had any notion of executing the last will. He was almost constantly under a greater or less exhilaration of drink, and the evidence shows that he was lavish in promises as to the disposition of portions of his property to different persons, and which promises he does not seem to have ever carried out. It may be that when the last will was written there was an indefinite purpose on the part of the decedent to execute it—a purpose which was abandoned upon later reflection. On the other hand, it may be that the decedent never intended to execute the will at all. Either view is not inconsistent with the claim of forgery. These are questions which I do not deem it material to decide. I am satisfied, first, that the signature to the will offered for probate is not genuine; and, second, that the conduct of proponent and her mother for nearly five years prior to its date indicates a plan or conspiracy of which the forgery is a natural result. Beyond that it is not necessary to go. Nor have the attitude and appearance of the parties most interested tended to allay the suspicions created by the evidence. There have been some facts in the case necessarily within the knowledge of proponent, affecting her reputation and pecuniary interest, as to which she would have been competent to testify. The fact that she has seen fit not to go upon the stand and do this necessarily creates the unfavorable inference which the rules of law and of common sense both impute to such silence.

The appearance of proponent's mother and sister as witnesses was not favorable to a belief of the truth of their testimony, while the other subscribing witness, Marshall, seems to have made many statements regarding the will of May 26, 1902, which are conflicting with his testimony, and his value as a witness is consequently materially impaired. Such of these statements as occurred before the trial were made to men whose standing and integrity have not been questioned.

As to the declarations of the decedent concerning the disposition of his property, and upon which proponent places much stress, counsel for proponent has stated the rule correctly—that such declarations are of doubtful value. They cannot be accepted as controlling proof of the fact which they purport to recite. The narrative of a witness of his conversation with a person since deceased is termed, in justice, the weakest of all evidence. He testifies without any possibility of

refutation by the person whose alleged statements he repeats. Testimony as to declarations of a deceased person should undoubtedly be disregarded upon the least conflict with the probabilities of the case. This does not necessarily imply that the witness relating the declarations is testifying falsely, but, either from lack of memory or misunderstanding, he may be giving an entirely erroneous construction to the declarations. So that when this testimony conflicts, as it does in this case, with stronger and more convincing evidence, direct or circumstantial, the court must disregard it. The testimony as to decedent's declarations given by the witness Fanning well illustrates the usefulness of this principle. This witness may have confused his own ideas of what the decedent ought to do for the proponent with the decedent's various alternative plans upon that subject. Besides, there seems to be some conflict between his testimony upon the stand and, his version of these declarations given by him to the witness Seward. Indeed, considering those declarations as a whole, they seem to show a rather insistent purpose to provide for proponent by securities or notes, rather than by will, and this view is greatly strengthened by the existence of the note for $10,000 made in February, 1903, and delivered to proponent several months after the date of the will propounded.

It seems that there was some conversation between the decedent and the witness Fanning on this subject as early as the year 1899, and they had a number of conversations about it afterward. The gist of these conversations was, I think, that the decedent desired to provide for the proponent either by a gift of stocks, or by notes, rather than by will, and in accordance with that purpose there was found in his box at the Fay Bank a package of securities marked with the proponent's name. I have already referred to the fact that the proponent, upon her mother's advice, demanded these securities of Mrs. Scott after the decedent's death and before his funeral, and the evidence shows that within a day or two of this demand the witness Marshall made a statement that the proponent was well provided for; explaining that in case of the decedent's death she was to go to Mrs. Scott for a package of securities which the decedent left for her. It is clear, therefore, that the decedent at one time entertained the idea of making the provision by gift of stocks. The testimony of Fanning indicates that the decedent held to this plan with some firmness, while the proponent, Mrs. Bell, and Marshall all apparently expected, down to the time of decedent's death, at least, that the plan was to be carried out. They also seemed to understand that Mrs. Scott was to represent decedent's estate. In fact, she was the sole beneficiary and executrix under the will of August 26, 1899, already referred to. The proponent did not succeed in getting possession of the securities, and subsequently placed the two wills in the possession of her counsel, who afterward offered the later will for probate in this proceeding.

But these are not the only provisions which the proponent claims the decedent made for her. She also claims to hold two notes made by him—one for $1,000, dated May 12, 1899, and the other for $10,-000, dated February 24, 1903, already referred to. The proponent

declined to produce the notes at the trial, although requested to do so by the contestants, but she conceded the dates and amounts. It seems reasonably certain that the decedent intended to provide for the proponent by gift of stocks or notes or both. At any rate, the gift of the last note in February, 1903, is strongly suggestive that he did not understand or intend that she was already in possession of a valid will made nine months before, giving her his entire property.

I have not been unmindful of the suggestion of counsel that the court should hesitate before pronouncing against the genuineness of the signature, as it would impute to some person (presumably some of the interested parties) the commission of the crime of forgery; and the task of reviewing and considering this case has been an unpleasant one in this regard, because this question was necessarily foremost. But this question, like any other, must be determined in accordance with the evidence, and I think there is no possible view of that evidence which brings the proponent's case within the decisions and statutes of this state in probate cases. Thus in Tarrant v. Ware, supra, the Court of Appeals stated the rule as follows (although admitting the will to probate):

"If, on examining all the witnesses, and considering the attending circumstances, a reasonable doubt remains whether one or more of the directions of the statute have not been omitted, probate must be denied, although it may be probable that the paper expresses the testator's intention."

And in Howland v. Taylor, supra, which, like this, was a case of forgery, the same court held that, "if the proof comes short of conviction, probate must be denied." In the latter case the decree of the Surrogate's Court admitting the will to probate was reversed by the Court of Appeals on the ground that, while the evidence was not sufficient to satisfy the court that the will was a forgery, it was not, on the other hand, sufficient to convince the court of its genuineness. The same principle is incorporated in our statutes:

"Before admitting a will to probate, the surrogate must inquire particularly into all the facts and circumstances, and must be satisfied of the genuineness of the will, and validity of its execution." Code Civ. Proc. § 2622.

To grant a decree admitting the will to probate in this case would be a violation of this rule, in view of the conclusions which I have been compelled to draw from the evidence, and in view of the several suspicious circumstances to which I have referred.

I have, perhaps, expressed my views more at length than is necessary to a decision of the case; but the questions at issue are important and complicated, the amount involved is large, and the evidence voluminous and conflicting. I have given to all the evidence and the exhaustive briefs of counsel prolonged and careful study, and I can see no escape from the conclusion which I have reached. Probate must be denied. A decree embodying these conclusions may be entered on two days' notice, with costs to contestants against proponent to be taxed.

Probate denied.