In the Matter of the Probate of a Paper Writing Purporting to Be the Last Will and Testament of EDWIN A. OLIVER, Deceased.

Surrogate's Court, Westchester County, February 11, 1926.

Wills — execution — burden of proving genuineness of will is on proponent — testator's will must be denied probate where evidence shows signature thereto was forged.

The burden is on the proponent to prove the genuineness of a will and the signature thereto, and before a will may be admitted to probate a surrogate, under section 144 of the Surrogate's Court Act, must be satisfied of its genuineness and the validity of its execution.

The probate of a paper offered in this proceeding as the will of the testator should be denied on the ground that it was not executed by the testator, but that the signature thereto was affixed by some third person, since it appears that the blank form on which the alleged will was executed was not printed until more than a month after said paper was drafted; that the signature thereto was not written by the testator, and that the testimony offered in support of said paper bore every evidence of falsehood.

PROCEEDING for probate of will.

*Cohalan & Cohalan [John P. Cohalan* of counsel], for the proponent.

*Henry M. Stevenson,* for the contestants.

*Scrugham & Arbuckle [William W. Scrugham* and *W. Chantler Arbuckle* of counsel], for the contestants.

*Paul Bleakley,* special guardian, contestant.

SLATER, S.   This is a contest of an alleged will of Edwin A. Oliver had before the court as the trier of the facts upon framed issues relating to the execution of the will, mental capacity of the decedent, fraud and undue influence, supplemented by the unusual issue of forgery.

Edwin A. Oliver died April 22, 1925, aged about sixty-nine years. He was formerly editor and publisher of the Yonkers *Statesman* and a well-known personage in the city of Yonkers. In his younger years he acquired distinction as a humorist and story-teller. He left him surviving Arthur Gunn and George Starin Cowles, nephews; Isabella Curtis and Eleanor Gunn McClelland Lavendar, nieces; and several grandnephews and grandnieces. Mr. Oliver had never married. He lived at 190 Warburton avenue, Yonkers, attended by his housekeeper. The value of the estate is about $60,000.

Two wills have been offered for probate. The will dated June 30, 1924, was offered for probate upon petition of the Westchester

Trust Company, the executor named therein, such petition being filed April 27, 1925. The will being contested was offered for probate upon petition of George Starin Cowles, the executor and chief beneficiary named therein, by a petition filed May 28, 1925. The contestants of the later will are some of the legatees and the executor named in the prior will.

The paramount issue is forgery. The issue of forgery is unusual in this court. The burden is not on the contestants of a will to prove forgery to the exclusion of every other reasonable hypothesis, but the burden of proving genuineness is on the proponent. (*Matter of Burtis*, 43 Misc. 437.) The surrogate may inquire particularly into circumstances surrounding the possession and custody of the testamentary paper propounded. (*Howland* v. *Taylor*, 53 N. Y. 627; *Matter of McDonough*, 201 App. Div. 203; *Matter of Jacobs*, 76 Misc. 394, and cases cited.) A will coming from the proper custody is presumed in the first instance to be genuine.

Before admitting a will to probate the surrogate is charged by the law to inquire particularly into all the facts and circumstances, and must be satisfied of the genuineness of the will and the validity of its execution. (Surrogate's Court Act, § 144.)

There is much contradiction in the essential testimony offered by the contending parties. Therefore, the court will refer to the material evidence. The testimony is that Mr. Oliver was a person who enjoyed intoxicating drink and during the last few years of his life was quite frequently under its influence. The testimony of his chauffeur, William Weeks, who was a witness to the will, is to the effect that during the two months spent in New Hampshire prior to the execution of the paper writing under consideration, he was frequently intoxicated. As he says: " Just about the same as ever, you know, off and on, maybe two or three days out of the week. He was under the influence two or three times a week." Asked if one intoxication would last for two or three days, he replied: " Sometimes it would, sometimes not, all depends on how long it took before it made him sick." And asked if he stopped it only by becoming sick and vomiting, answered " Yes."

The will of June 30, 1924, was prepared by his attorneys in Yonkers, Messrs. Scrugham & Arbuckle. It is a document of four typewritten sheets of paper. It indicates careful preparation. It made a distribution of his property among all his nephews and nieces, and others, including a gift of $4,000 to George Starin Cowles. Great care was given to a distribution of his personal belongings, such as jewelry, and legacies were bequeathed to several friends. The residue of the property was given to the two nieces,

Mrs. Lavendar, then Mrs. McClelland, and Mrs. Curtis. There was offered in evidence a copy of a prior will dated August 11, 1921, as well as ten sheets of paper in the pencilled handwriting of the decedent in the nature of a memorandum of direction. There was proof that even a former will had been made. The wills were of the same tenor. The burden of making an explanation and giving a satisfactory reason for the change is on the proponent. It requires of the proponent some proof in addition to that which will ordinarily suffice. (*Matter of Alfaya*, 122 Misc. 771, 775.) Up to June 30, 1924, there was strong proof of a continuing testamentary intent. The executed paper writing of June 30, 1924, was given to the decedent by Mr. Arbuckle, his personal counsel, and it appears the decedent placed it in his safe in his home in Yonkers, where he kept his valuable papers, because in the month of October, 1925, about the time the proceedings were started to have him declared incompetent, the safe was opened by Mr. Arbuckle in the presence of several members of the family, and the will of June thirtieth was found reposing in· the safe with other personal papers and securities.

June 30, 1924, fell on Monday. On Wednesday, the second of July, the decedent with his housekeeper, Elizabeth Stanley, his chauffeur, William Weeks, and his fox terrier, motored to New London, near Lake Sunapee, in New Hampshire, where he spent the summer of 1924. He returned with the same complement, arriving at his Yonkers home Friday night, September nineteenth, at about six o'clock. The house had been opened for him and the party was received by Mrs. Toy, a neighbor. The trip home was made in a day.

William Weeks, the chauffeur, a witness to the paper writing, gave testimony that he returned to the house later in the evening of the nineteenth of September and brought liquor with him for Mr. Oliver; that he next came to the house on Saturday morning, September twentieth, about half past ten o'clock; that Mr. Oliver was eating breakfast in the dining room clothed in his bathrobe; that later he went to Oliver's bedroom and held conversation with him; that Mr. Oliver brought out a will blank from a closet and told him that " he had made another will, but he thought he had made a mistake," and gave that as the reason why he wanted to make a new one; that Mr. Oliver asked him to write in the will blank his wishes as directed, which he did while both stood at the bureau; that it was written by Weeks' stylograph pen while the instrument lay on the top of the bureau; that, when the paper writing was finished, he gave it to Mr. Oliver who placed it in a drawer.

33

Surrogate's Court, Westchester County, February, 1926.     [Vol. 126

He likewise testified that he returned to the house the same day about half past three to four o'clock. Mr. Oliver was fully dressed, and he and Mr. Oliver sat in the back parlor listening to a phonograph; that Mr. Oliver left the room to obtain a cigar, and shortly thereafter he returned to the room in company with Nellie M. Drummond, the other subscribing witness to the paper writing; they ascended the inside stairway to the bedroom of Mr. Oliver; that Mr. Oliver asked him to get the paper from the drawer. Mr. Oliver looked about for his glasses. These could not be found. Then Oliver said: " Let me have a pen." " I handed him my pen." That he started to sign the paper writing by laying it on the top of the bureau, and pointed his pen to the top part of the will. "As he went to do that I indicated where he should sign it, and took his hand and brought it down as near the line as possible.. I held his hand on the paper, and as I did, I guided his hand, or steadied his hand, whatever you call it, and he made the signature as found on the paper." On cross-examination he described how he guided the hand, saying he laid his hand over Mr. Oliver's hand.

The other witness to the will, Nellie M. Drummond, testified in a similar manner as to the execution. Each testified as to just how the guiding of the hand was done; that the signing was done on the bureau which had a cover over the top, with toilet articles thereon. The testator and the two witnesses were standing up. She testified that William Weeks stood at the right side of the testator, and took hold of Mr. Oliver's hand, by laying his hand fully upon Mr. Oliver's hand, so that the fingers and thumb of the hand of the witness Weeks were on top of Oliver's fingers and thumb, making a complete covering until the signature was entirely completed. This was demonstrated in court by each witness. Each witness testified that Mr. Oliver said it was his will and asked them both to sign as witnesses, and that they did sign in his presence.

Weeks testified that after Miss Drummond had departed, Mr. Oliver told him to take the paper and keep it, and if anything happened to him, to give it to Mr. Cowles, meaning the chief beneficiary; that he took the paper to his home and put it in a book which is in evidence, labeled " Cadillac Shop Manual; " that it reposed in this book on the shelf in the bedroom of his home until after Mr. Oliver's death, when he gave it to Mr. Cowles.

The witness to the will, Nellie M. Drummond, first testified that she was walking in a northerly direction on the westerly side of Warburton avenue on the day of the will making. Later, she was not positive as to whether she was on the westerly or easterly side of the avenue. She says Mr. Oliver beckoned to her from the

Misc. 511]    Surrogate's Court, Westchester County, February, 1926.

window to come into the house, which is located eighty feet back from the easterly side of the street line.   She says: " By the time I got across the street and up the path he was on the front porch and said: ' Nell, I wish you would come in here and do something for me.' "   This witness also testified, first, that Mr. Oliver was standing in the window next to the front door.   Subsequent to the date of that testimony a picture of the house, taken during the trial at the court's request, was offered in evidence, which discloses the fact that there is a heavy wistaria vine which almost covered the entire front porch, making it barely possible for a person standing on the sidewalk to observe a person standing in the window next to the front door.   Later, her testimony on this point was changed so that Mr. Oliver was standing in the window of the dining room, which the same picture discloses to be quite free from obstruction.   Miss Drummond testified that she did not see the housekeeper at the time of her visitation.

The chief beneficiary of the will, George Starin Cowles, had been a member of Miss Drummond's household as a boarder in her mother's family for nearly ten years, and her social companion.

Elizabeth Stanley, the housekeeper for a period of nine years, and a witness interested in the prior will as a legatee, gave testimony to the effect that she was in and about the house all day of September twentieth; that she was in Mr. Oliver's bedroom unpacking trunks and hanging up his belongings between the hours of one and five-thirty, with four visits intervening made to the kitchen to care for cooking a chicken fricassee, the chicken which Weeks purchased in the morning, and that the witness Nellie M. Drummond did not come into the house, nor to Mr. Oliver's bedroom on that day.   She also says that she did not hear the phonograph that day, also testifying that in the morning she let the chauffeur, Weeks, into the house, which was protected by a locked screen door and a locked front door; that he took her order for food for Sunday to be brought by him, went and bought it and brought it back to the house and she went with him to Mr. Oliver's bedroom where Mr. Oliver signed a check for $245 with a pen and ink that was brought by her from the dining room to his bedroom; that as soon as the check was drawn by Weeks, and signed by Oliver, the chauffeur left the house, the time being about twelve o'clock noon. The check is in evidence.   The body of the check is in the chauffeur's handwriting and signed by the decedent by a two-nib pen. It is his last signature prior to the one claimed to be his on the disputed paper.   Four hours elapsed between the time the check was signed and the execution of the will.   The housekeeper testified that in the afternoon she let the chauffeur in the house at about

four o'clock. He rang the bell and the dog barked. He had brought with him a half case each of wine and whisky which he took to Mr. Oliver's bedroom; that she went upstairs with him; that the chauffeur immediately came downstairs with her and she let him out of the house. She also testified that no meals were prepared, nor served to any one, except herself, and that Mr. Oliver was in bed sleeping that day. . Elizabeth also tells that the bureau cover was a Mexican drawn-work piece.

The fox terrier of the household plays an important part in this case because he, like all other fox terriers, was a barking kind, and the approach of any one to the door brought his presence and his bark. This canine guardian of the home did not remind the housekeeper that there was any stranger about the house on Saturday, the twentieth of September. There is a strong divergence in the testimony of just what happened upon that ominous day in the Oliver household.

The chauffeur left on Monday morning, September twenty-second, to return to New Hampshire, for what purpose was not disclosed. The check secured on Saturday was cashed and used for the trip. On Friday of that week, September twenty-sixth, Dr. Moffatt, the family physician, was called in. He found the decedent vomiting and in a semi-comitose condition, could not answer intelligently and gave every evidence of a very serious alcoholic attack. On December 23, 1924, an order was entered in the County Court of Westchester county adjudging the decedent incompetent, and the order remained effective until his death.

Under date of August 8, 1924, from Lake Sunapee, Elizabeth Stanley, as secretary for Mr. Oliver, wrote a letter to his niece, Mrs. Curtis, in Wisconsin, inclosing a check signed by E. A. Oliver to the order of Belle Curtis for $500. There was offered in evidence a letter from Mr. Oliver under date of May 30, 1924, to his grand-niece in Wisconsin, the daughter of Mrs. Curtis, which indicated his affection for her, reciting the fact that he had written to her mother, his niece, inclosing a check. The letter was signed, " With love, Uncle Ed."

Cordial relationship was apparently maintained with his nephews and nieces. The proof is that George Starin Cowles, the main beneficiary of the document, was not a frequent visitor to the home, and that he was a creditor of the decedent as evidenced by a letter from Cowles to the decedent, which was offered in evidence.

It is the contention of the contestants that the document was never signed by Mr. Oliver; that Nellie M. Drummond, the witness to the will, did not enter the home of the decedent on the day in question; that on that day the decedent was under the influence

of liquor, and remained in bed all day; that what purports to be his signature is a forgery and that the law blank on which the will was written was not even printed until October 24, 1924.

The proponent relies upon the testimony of the two attesting witnesses to the will.

Two handwriting experts were called in behalf of the contestants. Standard signatures of the decedent upon about 200 checks extending over a period from 1916 to November, 1924, including the signature to the check which was signed about four hours before the will was executed; letters dated 1921; May 30, 1924; February 21, 1922; July 8, 1922; June 28, 1922; February 7, 1922; April 19, 1922, and May 27, 1922; a power of attorney dated July 3, 1923, and the decedent's will dated June 30, 1924, were received in evidence. There were a large number of checks signed by the decedent in nearly every month of the year 1924, checks drawn at Yonkers, as well as many signed at his New Hampshire summer home just before his return therefrom.

These writings of the decedent were proved to the satisfaction of the court to be the genuine handwriting of the decedent, and comparisons were made of the disputed writing with these standards by the two experts. (*Matter of Burbank*, 104 App. Div. 312; affd., 185 N. Y. 559; *Turnure* v. *Breitung*, 195 App. Div. 200.) It was the opinion of the experts that the disputed signature was not written by the same hand that wrote the standard signatures. They stated their reasons for their opinions. (*Matter of Koch*, 33 Misc. 153.) The testimony of the subscribing witnesses as to the manner of the signing played an important part and was an influencing factor, apparently, in the opinion of the experts. The experts testified, and stated as reasons for their opinion, that the form of the letters in the disputed signature, compared with standard signatures, especially near the date of September 20, 1924, were too perfect to have been written by the writer of the standard; that the signature was too well executed to be written under the alleged conditions as testified by the witnesses to the will, and as the court has recited herein; that none of the standards in evidence compared anywhere near with the concept of the form of letters to be found in the disputed signature; that the writing in the disputed signature is of very much higher character in the formation of the letters alone than in any of the standards near to the time; that even the formal documents, the will and the power of attorney, are not signed with the form of letters that are used in the signature to the disputed will. The lines in the signature to the will are smooth and free and lack even a tremor. In the opinion of the expert witnesses the attempt of two hands to write a signature is always

Surrogate's Court, Westchester County, February, 1926.    [Vol. 126

made with great difficulty.   One difficulty is getting a pen down
on the paper to start.   There is no evidence in the disputed sig-
nature that the pen was raised, or the motion was stopped, or
interrupted.   This condition is wholly at variance with two hands
attempting to write.   The alignment of the disputed signature is
almost  perfect.   That  alone  is  inconsistent  with  two  persons
attempting to write, especially when the guider is in a standing
posture,  and  the  person  who  holds  the  pen  is  standing.   This
position  is  inconsistent  with. accuracy,  especially  the  accuracy
which  is  exhibited  in  the  disputed  signature  with  regard  to  the
line, and the uniformity.   There is hardly any deviation in the slant
from the beginning to the end.   The middle letter "A" of the name
at the top of the paper writing is formed entirely differently from
the  "A"  in  the  disputed  signature.   So,  if  a  person  guiding  the
hand usually began to make the capital "A" at the top, as we have
in the disputed document, and which the witness Weeks testified
he wrote, in making the signature Weeks would attempt to begin
at the top and Mr. Oliver at the bottom, there would certainly be
a conflict of movement impulses resulting in either a very shortened
stroke, or a very long stroke.   A pronounced bad signature would
result.   When the movement impulses of two writers is in the same
direction you have a long stroke.   Here, the impulses were in
opposite directions, and hence they would work in conflict.   In the
disputed signature there is utter lack of evidence of a conflict of
movement in any part of the disputed signature.

Certain  other  class  of  evidence  was  offered  by  the  contestants.
I allude to this character of evidence as the silent and convincing
kind of evidence.   It is mute, but registers conviction.   The paper
writing sought to be probated was written upon a blank which the
general manager of the firm of Julius Blumberg, law blank publisher,
262 Grand street, New York, testified was printed by his concern;
that when printed and sold the blank consisted of two sheets of
paper.

The paper writing under discussion was filed in this court as a
single sheet of paper, the outside sheet containing the indorsement
" Last  Will  and  Testament  of "  having  been  cut  off.   With  its
removal a portion of the top part of the will sheet itself was also
cut off.   Law blank publishers nowadays mark their blanks with
code letters, which indicate the month and day and year when the
blank is printed, and the quantity printed.   This witness testified
that the disputed paper writing was one of a printing of 8,000 or
more blanks from the press on October 24, 1924, over a month after
the execution of the so-called will; that the blank had had thereon
at its top: " 183. Will.   V. DF.  DF K.," these letters meaning

Misc. 511]    Surrogate's Court, Westchester County, February, 1926.

October 24, 1924, 8,000, with the name and address of the law blank publisher following.    A printing of this form 183 of the law blank prior to the date of the will was on January 8, 1924; that the same type was used for a printing in February, 1924, of form 184.    The form 184 printed the top part of the will on the first sheet and the " In Witness Whereof " part and the attestation clause on the bottom of the second sheet, permitting greater space between the two parts than indicated on the form 183.    The second sheet of form 183 had all the printed words on one sheet.    The location of type to secure more space was the only difference in the forms 183 and 184. Mr. Zigman, the stationer's witness, testified to certain differences between the blank forms printed in January and February, 1924, and the form printed in October, 1924.    To illustrate: He pointed to a difference in the space between the figures 262 and the word " Grand " on the slug at the top of the blanks, and distinguished typographical variations in the type used in the word " affixed." The January and February printing carried the same type in the form in the chase, showing a single " f " and " fi " combined, while the October printing carried one piece of type for the diphthongized or barred letters " ffi."    Again, the letter " t " in the word " this," was distinguished.    In the January printing the alignment is accurate, while on the disputed document and the October printing the letter " t " is dropped.

From his comparisons he testified that in his opinion the paper writing in dispute was one of his firm's form blanks 183 printed on the 24th of October, 1924, a month and more after the date of the paper writing.

The most silent and at the same time the most vociferous evidence proves to be the tail of a comma.    In dissevering the top of the blank the tail of a comma between the words " Street " and " New " in the address of the stationer, as well as the slight lobes of the letters in " Grand " and " Street " were left on the paper writing.    The microscope shows it.    An enlargement of the tail of the comma and the lobes of the letters by photostat process and enlargement makes it certain.    A demonstration at the trial through the aid of microscopic instruments revealed that the tail of the comma and the lobes of the letters in " Grand " and " Street " left upon the disputed instrument would not match the top of the comma, and the letters upon the forms printed in January and February, 1924, but did match exactly the comma and letters upon the form of · October 24, 1924.

One expert directed attention to fifteen differences in letters existing in the blanks of the January and February printing and in the October printing.    These differences were apparent to the

naked eye; the microscope made them conspicuous.   In every case of difference the disputed will was like the printing of October 24, 1924.

The expert also testified to the slight difference existing in the two printings in manner of alignment of words and lines, indicating a dissimilarity existing in the January and October printing and that the will was like the October printing.

The learned counsel for the proponent elicited from Stein, one of the handwriting experts, that there were hundreds of microscopic differences between the letters printed on the will form in dispute and the October printing.   They were apparently all dissimilarities caused by the inking of the press, and the character of the surface of the paper.   The naked eye could not observe the variances.   The differences disclosed to the unglassed eye clearly marked the similarity of the disputed will to the October printing.

It was shown by testimony that in printing the forms of will blanks prior to January 8, 1924, the word *"twenty"* in the date of the " one thousand nine hundred and .... " was omitted.   In the January 8, 1924, printing the word " *twenty* " was used for the first time.   The disputed will blank contains the words " in the year one thousand nine hundred and *twenty.*"   Consequently, the will blank employed in preparing the disputed will was printed either on January 8, 1924, or on October 24, 1924, because each of these printings contained these words: " in the year one thousand nine hundred and *twenty.*"   As form 184 was printed in February, 1924, from the same type as used in the January printing, an examination of the blanks in evidence of the February printing indicates that there was no change made in the type; therefore, it must be conceded no change was made in the type at the time of the January printing of form 183.

The testimony of the two attesting witnesses creates grave doubts in my mind as to the genuineness of the paper writing offered for probate.

Weeks testified that on Saturday morning his employer was perfectly sober; that he was in the dining room eating bacon and eggs and coffee for breakfast.   It appears that both pen and ink were kept on a table in the dining room where Weeks said his employer was having breakfast at half past ten o'clock.   We find the check was drawn that morning in the bedroom, and that Elizabeth Stanley, the housekeeper, took the ink and pen from the dining room to the bedroom.

Where did the decedent obtain the will blank?   It will be recalled he executed a carefully drawn document on June 30, 1924, and on the second day thereafter motored to New Hampshire and did not

Misc. 511]     Surrogate's Court, Westchester County, February, 1926.

return until the evening before the disputed paper writing was executed.

How did the law blank get into the decedent's possession and on the closet shelf? Where did he obtain it? And why? It could not have been purchased after his return on the nineteenth of September, because the testimony is, he did not leave his home on that evening, nor the next day. There is no evidence that he sent for it.

Who cut off the second sheet of the law blank, together with the top part of the other sheet containing the name and street address of the law blank publisher? Did Oliver have any reason to remove the code letters thereon? The decedent certainly would have no reason for doing so.

But who is the person who desired to conceal the printing on the top of the blank? Whoever it was, his failure is apparent. The fact of the cutting of the will form in this manner is a most suspicious circumstance, and should require a satisfactory explanation from the proponent. None, however, was forthcoming.

The decedent, a former newspaper editor and publisher for many years, skilled in the use of the English language and accustomed to exercise that skill for years, for a livelihood and substance, summoned as the draftsman of his will, a sacred document, his chauffeur, one who was so illiterate as to be unable to spell some of the words in the will, as he himself relates, without assistance from the decedent. Why should a man who had always had an attorney prepare his former wills have one drawn in this informal manner by his chauffeur?

The relationship of employer and employee listening to the phonograph in the back parlor and having drinks together is at least out of the ordinary.

Oliver goes for a cigar; but instead obtains a witness to his will by beckoning to her to come in and goes out on the porch to tell her why she is wanted. Weeks is listening to the phonograph, and has no knowledge as to how Miss Drummond obtained entrance. The first thing he knew, she and Mr. Oliver were standing at the entrance to the back parlor.

Weeks testified that the decedent had at least four or five pairs of eye-glasses. They were all strangely missing from the bedroom, however, at the time the will was executed. The decedent was in such haste to sign his name to this new document that he did not send to the lower floor, where he had been, to search for a pair of glasses. In lieu he accepts the stylographic pen and the assistance and guidance from the chauffeur in signing the document. The result — a perfect E. A. Oliver signature. When the document is

fully executed, it is not placed in the safe of the decedent by this fully dressed testator, where his valuable papers and his former will at that very moment were reposing — the most natural thing for him to do — but it is given to the chauffeur to take home, with instructions upon his demise to hand it to the beneficiary, George Starin Cowles.

The signature upon the propounded document varies from the signature on the check made by the decedent on the morning of September twentieth, and from all other signatures in evidence. The disputed signature shows total absence of tremor, which appears in all the standards in evidence.   It shows no variableness at all. That a man sixty-nine years of age who habitually used intoxicants for many years, frequently to excess, can write so good a signature as is found on the will, free from tremor or quaver, or jerks, or angles, is an impossibility known to all from common experience with humankind.   A grotesque caricature of the natural signature of any person will be produced by someone lending assistance in the writing operation, as testified to in this case, as by resting the weight of another's hand upon that of the writer in the attempt to direct the formation of letters and the alignment thereof.

The will had to be executed on this Saturday or Sunday, the twenty-first, if the chauffeur was to be a witness thereto, because the chauffeur started to return to New Hampshire early Monday morning, September twenty-second.   Upon his return, the Thursday following, he found his employer in the care of a physician and clearly incompetent.

The signature is perfect.   It is artistically and deftly executed. The testimony as to the guiding hand, the hand resting upon the right hand of the decedent, and assisting in the construction of the letters of the signature upon the disputed paper is not convincing to my mind.

Opinion evidence is to be regarded, of course, but if the testimony of the handwriting experts is disregarded in their entirety, and I have regarded them as arguments only, rather than proof (*Matter of Kearney*, 69 App. Div. 481, 484); if all other testimony in the case, except the testimony of the two attesting witnesses, is forgotten, the mind of the court would not be satisfied that the signature is genuine, and that the will spoke the wish of Edwin A. Oliver.

It clearly and conclusively appears to me that the alleged will of September 20, 1924, is not the will of the decedent; that the signature on that paper writing is not his genuine signature.   Two mental conceptions cannot produce such a perfect signature.   Such a joint operation, as shown by the evidence, produces a scrawl and

comparative illegibility.   It is entirely dissimilar from his standard signatures, the one to the check of September 20, 1924, as well as all others in evidence.

In my opinion he could not write his signature on September 20, 1924, without tremor, and without angles.   The signature was not written by two hands, one lying upon and guiding the other.   It cannot be done with the result as disclosed upon the disputed document.   By what means and by whose direction the signature arrived upon the paper  I am not prepared to state.   It is not necessary.

The burden is upon the proponents, those who offer the will, by a fair preponderance of the evidence, which means the probability of its truth.   The proponent in the instant case has not sustained the burden imposed by the law, as the evidence preponderates in favor of the contestants.   Having no personal knowledge of the transaction, common knowledge and experience decides which set of witnesses raised the greater probability of its consistency with truth.   It is difficult to overturn oral testimony of subscribing witnesses.

The truth must be found in the evidence itself, and every item of proof must stand on its own foundation.   In this test, presumption creates no  advantages in the unbiased search  for truth; the law  has no favorites by presumption.   Silent circumstances without power  to  change  their  attitude,  or  to  make  explanations, or to commit perjury, speak more powerfully and more truthfully in court than animate witnesses.   If the truth is found in oral testimony, it must determine the issue, but it is equally potent if found in mute circumstances.

I reach the conclusion that the issues must be decided in favor of the contestants because the will does not speak the word, nor is it the will of the decedent.   The burden cast upon the proponent has not been met, and grave doubts in my mind remain unremoved. (*Matter of Alfaya*, 122 Misc. 771.)

I find  as a fact and as a matter of law that the signature of the decedent upon the paper writing was not written by the decedent.

Probate is denied.

In view of the evidence, the court will direct the clerk of the court to forward a copy of the testimony in the case to the district attorney of Westchester county for his analysis and consideration.