In the Matter of the Estate of CHARLES W. SHAVER, Deceased.

Surrogate's Court, Oneida County, September 24, 1928.

*James T. Cross*, for the proponent.

*D. Francis Searle*, special guardian for Charles Irwin Ward, Catharine M. Ward and John Wesley Ward.

*George J. Skinner*, executor in person.

EVANS, S. Dr. Charles W. Shaver was for many years a practicing physician in the village of Camden, N. Y. He died on October 23, 1927, leaving a widow, Mrs. Jean Clelland Shaver, and an adopted daughter, Mrs. Charlotte Ward, who resides at Taberg, N. Y.

Mrs. Ward is now about thirty-eight years of age and was adopted when she was about two weeks old and for all intents and purposes she and her three children were regarded by Dr. Shaver the same as blood relatives.

Dr. Shaver was a widower when he married Jean Clelland on June 4, 1925. Her present age is forty-seven years.

An instrument purporting to be his last will and testament bearing date June 1, 1926, was filed with this court on October 28, 1927, and duly admitted to probate without objections on the same date.

Hon. George J. Skinner of Camden, N. Y., was named as executor and he duly qualified and proceeded to administer the estate. Mr. Skinner is an attorney of excellent standing in Oneida county and now is and has for several years been the representative of his district in the New York State Assembly.

On December 21, 1927, Mrs. Jean Clelland Shaver came to the surrogate's office at Utica, N. Y., and handed to the clerk of the court a sealed envelope bearing the inscription: "Property of Charles W. Shaver, not to be opened until after my death."

The envelope was opened by the clerk of the court and contained a paper purporting to be a will of Dr. Shaver bearing date May 10, 1927.

Proceedings to probate the later document and to revoke the probate of the prior will were instituted by Mrs. Jean Clelland Shaver. The will already probated provides a legacy of $6,500 to the widow and also all furniture and house furnishings purchased after June 1, 1925, are to be hers.

A legacy of $1,000 each to the three minor children of his daughter, Charlotte M. Ward, is given, and the residue of the estate passes to Charlotte M. Ward.

The document filed on December 21, 1927, provides a legacy of $10,000 to the widow, Jean Clelland Shaver, the life use of $10,000 and the life use of the house where Dr. Shaver lived. Furniture and house furnishings purchased after June 1, 1925, and the

automobile were also bequeathed to her. After her death the fund of $10,000 is bequeathed to the daughter, Charlotte M. Ward, who is also the residuary legatee. The house is devised equally to the three minor children of Charlotte M. Ward. The executor named is Hon. George J. Skinner. On behalf of the infants, Charles I. Ward, Catharine M. Ward and John Wesley Ward, whose interests were affected by the later document, Mr. D. F. Searle was appointed special guardian and he filed an answer denying the execution and publication of the instrument.

The issue is forgery. The position taken by the contestants is that the document sought to be admitted to probate as the last will of Dr. Shaver is a forgery and that his widow is the author of the forgery.

The issues thus raised were tried before the surrogate without a jury.

An examination of several contested will cases where the issue was forgery seems to indicate that this issue is quite likely to concern estates of men of affluence with no close family ties. (*Matter of Oliver*, 126 Misc. 511; *Matter of Burtis*, 43 id. 437; *People* v. *Patrick*, 182 N. Y. 131.)

The case under consideration is lacking in that feature.

Dr. Shaver was a man about seventy-two years of age at the time of his death. He was a man of high standing as a citizen and physician. He practiced his profession for many years in Camden and in the surrounding territory. The evidence shows that his home life was happy and normal. There is proof that he entertained a natural love and affection for his wife, his daughter and her children. It is with this environment as a background that we mobilize the various elements and circumstances in the latter days of the testator's life in order to discover the solution of the problem here presented:

Contests over the probate of wills are common. The usual grounds assigned are lack of due execution, mental unsoundness of the testator and undue influence. The issue of forgery is rare. A will is unlike any other document. There is a saying current among the legal fraternity " that no will has a brother."

The forgery of checks, notes, drafts and other commercial paper is common. The annual loss through this means is said to be large. Unsuspecting merchants and other business men are frequently the victims. The check worker may ply his nefarious trade alone and unaided. The forged will is in a class of its own. The very nature of the act involves a conspiracy and requires the concerted action of several persons. Single-handed fraud is impossible. A will requires at least two attesting witnesses. It must

be admitted to probate by a court of competent jurisdiction. There can be no haste or disregard of legal requirements. Every person having a legal interest in the estate is cited to appear in court. A will must run the gauntlet of many sharp eyes and keen inquiring minds. It may be subjected to attack by hostile heirs or next of kin. Before admitting a will to probate the surrogate is charged by the law to inquire particularly into all the facts and circumstances and must be satisfied of the genuineness of the will and the validity of its execution. (Surrogate's Court Act, § 144.)

The burden of proof to establish the genuineness of a will is with the proponent. (*Howland* v. *Taylor*, 53 N. Y. 627.)

It is thus apparent that an attempt to foist upon a court a spurious will is attended with many difficulties and dangers. Before discussing the concrete issue of forgery, attention must be given to certain facts not in dispute to ascertain what if any assistance they render in deciding the main question.

What are the landmarks and the signposts in this controversy? A gratifying condition is presented in the trial of this case in that the witnesses sworn on both sides are high grade men and women. There is no inconsistency in stating that the testimony of these witnesses bore the earmarks of truth. There is little contradiction here but merely difference of opinion and opposite conclusions.

Members of the legal profession are aware of certain characteristics that people manifest about drawing a will. Two extremes may be mentioned. One is the type who procrastinates and displays almost a superstitious dread or aversion to making a will. The other type executes many wills with codicils and changes that are almost bewildering. The executor testified that he had prepared four wills for Dr. Shaver. This fact justified the belief and tends to indicate that his mind was subject to change and that he had no permanent, fixed and settled purpose in the final disposition of his property. This is some evidence that the making of a new will accords with the habits of the testator. We also have the right to infer that Dr. Shaver acquired some experience in the drafting of wills at least about the requirements of witnesses and signing in their presence.

Another test applied in will contests relates to continuity of testamentary intent. Do the provisions of a document sought to be probated as a will harmonize as a whole with other wills made or with declarations of the testator?

Are the beneficiaries named the natural objects of the testator's bounty, or does the document show an unnatural or strange disposition of the property?

Does the instrument shock the average person's sense of justice

and does it indicate the product of an unsound mind, fraud or undue influence?

A testator is not legally bound to follow or to cater to the orthodox notions of the public in making his will and may impoverish his widow and children, but where family relations are normal such a course would properly arouse suspicion. A document filed as a will with provisions so contrary to human sentiments would ordinarily require explanation.

A comparison of the disputed document with the will now probated discloses that the beneficiaries are the same, viz., the widow, Jean Clelland Shaver, the daughter, Charlotte M. Ward, and her three children.

Hon. George J. Skinner is named as executor in the probated will and also in the disputed document.

The beneficiaries are the persons who would ordinarily be considered the natural objects of the testator's bounty in both documents.

The value of the house is estimated at from $4,500 to $5,000. The probated will provides a bequest of $1,000 to each of the three grandchildren, $3,000 in all. The disputed document devises to these same grandchildren the house, subject to the life use of Dr. Shaver's widow. While the time of enjoyment of the property is postponed, the value to each is increased from $1,000 to approximately $1,500 or more.

The provision as to furniture and house furnishings purchased after June 1, 1925, belonging to the widow are the same in the probated will and in the disputed will except that the automobile is added in the latter document.

The probated will provides a legacy of $6,500 to the widow and the disputed document provides $10,000.

The life use of $10,000 more to her, as provided in the disputed document, has no counterpart in the probated will.

The residuary legatee in both the probated will and the disputed document is the daughter, Charlotte M. Ward.

Applying the test of continuity of testamentary intent, I think that it must be held that there is a marked similarity as a whole in the probated will and the disputed document.

The beneficiaries are the same, and the same executor is named. The ideas and general scheme of the disposition of the property are alike. There is no intrusion of a strange and unexplained beneficiary to cast suspicion on the disputed document. The changes for the benefit of the widow are not so sweeping and drastic as to shock the sense of justice of the average person. This feature of the case is not decisive but it is one of the useful elements to be

considered. Another circumstance deserving attention is the selection of attesting witnesses. The making of a will is generally a deliberate act. Except in cases of imminent death, it is not done hastily or on sudden impulse. It, therefore, becomes important in contested cases of alleged bogus wills to inquire whether the attesting witnesses are persons who might naturally be chosen by a testator.

Knowing the mode of life of a testator and all of his home surroundings, do the witnesses in the document fit into the picture? Courts consider this in its bearing on the main issue.

The request to act as attesting witness signifies an abiding trust in the one chosen which is obviously desirable where death is to separate the act from the proof of it.

Prudent persons ordinarily exercise care in this selection in order that they may feel assured that their purposes after death may be accomplished and not thwarted. (*Matter of McDonough*, 201 App. Div. 203.)

The Court of Appeals in an opinion by Judge EARL states: "There is nothing in the statute which requires any particular qualifications of the witnesses. * * * It cannot be doubted that it is wise on such occasions to call as witnesses persons who have previously known the testator or testatrix. The evidence of such persons would in all cases be more satisfactory." (*Marx* v. *McGlynn*, 88 N. Y. 357, 369.)

The witnesses in the disputed document are Harriette B. Clark and Mary E. Warne. Mrs. Clark was a former resident of Camden and has for forty-eight years spent all or a portion of each year in that village. She was acquainted with Dr. Shaver for at least twenty years and in 1927 was a next door neighbor. She was friendly with both Dr. and Mrs. Shaver and during the summer months was in the Shaver residence nearly every day and had conversations with Dr. Shaver. She also accompanied him at times in his automobile while calling on patients.

Mrs. Warne is seventy-three years of age, and was acquainted with Dr. Shaver for twenty-five years. She is an aunt of Mrs. Shaver. Mrs. Warne has lived in Camden for several years and was frequently at the Shaver residence. Friendship and long acquaintance would seem to make their selection by Dr. Shaver a reasonable and natural choice. There is nothing in this fact to create suspicion or to brand the document as fraudulent.

These attesting witnesses testified that on the afternoon of the day that the disputed document bears date, they called at the Shaver residence to see Mrs. Shaver. It appears that she was weak from the effects of two operations during the preceding

eighteen months. The witnesses did not see Mrs. Shaver and were sitting in the living room. Dr. Shaver came to the door of the living room. Mrs. Clark inquired of him how Jean (meaning Mrs. Shaver) was. He replied that she was upstairs lying down. The doctor made a gesture or beckoned to the two women and said: "Come here, I want you." They arose and followed him through the office into a small drug room. He said: "This is to be strictly confidential, this is my will, and I want you women to sign it as witnesses to my signature." He then sat down and signed his name to the disputed document and he got up out of his chair and Mrs. Clark then sat down and signed her name, and was followed by Mrs. Warne; the doctor then said: "Now, I don't want this talked about." Mrs. Clark and Mrs. Warne left the house without seeing Mrs. Shaver. They chatted together a few minutes in the living room and then went home. There was but one chair in the drug room and there were a number of pens and bottles of ink on the desk. Mrs. Clark did not use the same pen as Dr. Shaver. Mrs. Warne selected a fine pen for her own use. Mrs. Charlotte Ward, a witness for the contestants, testified that her father "had any number of pens on his desk," and that he sometimes used a fountain pen.

There is evidence that the will now probated was disappointing to Mrs. Shaver. It also provoked indignant discussion among her friends. The two witnesses to the disputed document did not divulge to Mrs. Shaver that they had witnessed a later will of Dr. Shaver. Their explanation is that she was weak and nervous as a result of two operations; that the disputed document could not be found and such a revelation in their opinion would accomplish nothing except to aggravate her condition. They claim to have talked together about the incident of May 10, 1927, but not in the presence and hearing of the widow. The contestants contend that the disputed document is manufactured and a fraud in its entirety. They advance the theory that the two attesting witnesses and the widow were indignant and resentful over what they considered an injustice to the widow and that this feeling gave birth to the idea of constructing a new will with provisions more favorable to Mrs. Shaver.

Applying to this theory the undisputed evidence alone, we have here three women, one seventy-three years of age, and the other two in middle life. Their residence in Camden extended over many years. They have the stamp of respectability and good social standing in their community. This alleged plot was no light and trivial matter. It meant the commission of serious crimes, including conspiracy, forgery and perjury. The question

confronts us whether these women gauged according to accepted standards of human conduct would suddenly become criminals? Was the financial gain a sufficient motive for Mrs. Shaver? Was friendship for her so intense and compelling that Mrs. Warne and Mrs. Clark should ignore their natural instincts for right living and enter the zone of danger and crime? Good character of a defendant on trial charged with crime is a factor to be considered by a jury. The good character of these three women too must have its proper consideration and weight here. The appearance and manner of a witness while testifying in court have their bearing in deciding the truth or falsity of the testimony. These witnesses told their story in a simple and natural way. Cross-examination failed to fluster or confuse them. A story with no basis of truth and one of pure invention is pregnant with danger and pitfalls.

The will now probated was read to the family by Mr. Skinner, the executor, on the evening following the funeral of Dr. Shaver.

The proponents produced proof through Mrs. Shaver to the effect that she declared her belief then that another will existed; that this was followed by a search in the safe for the supposed will by Mrs. Shaver, her brother and Mr. Skinner. There were bank books taken from the safe by Mr. Skinner, the executor, but he testified that he had no recollection of a will being mentioned.

According to the proof offered by the proponents, the search for the supposed will was continued by Mrs. Shaver, Mrs. Warne and her brother. They looked in the doctor's office, and in various places in the house without success. Mrs. Shaver testified that on December 21, 1927, she was endeavoring to find a box of Christmas seals. She looked into a drawer of a chiffonier where underwear and personal effects were kept. There was a photograph which she picked up, also a square envelope containing her marriage certificate and she then noticed a long envelope with sealed side up. This envelope bore the inscription before noted and contained the disputed document. Mrs. Shaver also testified that at least two months before the death of Dr. Shaver she had seen the sealed envelope with the inscription on his desk and in his safe. The testimony relating to the search and discovery of the disputed document comes from highly interested witnesses.

Is it a fabrication or did some sentiment cause the testator to place this envelope with the marriage certificate? The credibility of this testimony must be tested according to how well it harmonizes with certain conceded facts. The disputed document consists of 392 words and 1,256 letters and 32 figures in what purports to be the handwriting of Dr. Shaver. Shortly after his death the furniture was divided between Mrs. Shaver and Mrs. Ward pur-

suant to the terms of the probated will. At the time of this house cleaning, a ledger showing accounts of various patients was taken by the executor, presumably to enable him to collect them.

Canceled checks to· the number of over a hundred, an order book, a prescription book and a check book, in all containing hundreds of samples of Dr. Shaver's handwriting, were delivered to Mrs. Ward and carried away by her. This was done with the consent of Mrs. Shaver and the executor. It appears that these books and papers were regarded as rubbish and of no value. The evidence shows that little or none of Dr. Shaver's handwriting remained in the Shaver home.

It is evident that if Mrs. Shaver was plotting and scheming to manufacture a spurious will of 392 words and simulate the handwriting of her dead husband, then her approval in removing from her possession every available sample of his genuine handwriting was most unusual.

Instead of rubbish, these discarded books and papers possessed unlimited va'ue in aiding the construction of a spurious will.

This incident is undisputed and its significance to me stands out starkly.

Both sides offered proof of conversations and declarations of the testator with reference to what provision he had made about the disposition of his property after death. Each side objected to the other's line of evidence in this particular. This evidence, I think, was properly admitted as it had a direct bearing on the issue in the case.

In *Matter of Burtis* (107 App. Div. 51) the court stated (at p. 56): " If the evidence in the case clearly established that the signature to the will in question was a forgery, the intention of the deceased in respect to the proponent as to the disposition of his property would be wholly immaterial.

" But if upon the direct and expert testimony that issue is invo'ved in doubt, then the intention of the alleged testator in that regard becomes of very great importance.

" Concededly, if it were undisputed that the testator intended the proponent should have his entire estate, his alleged signature to an instrument giving effect to such intention, although its genuineness were in dispute, would be subject to much less severe scrutiny than if, by means of such signature, his property were to be disposed of in a manner contrary to his intelligently expressed intention."

This ru'e applies with added force to the case at bar for the reason that the declarations of the testator referred to what he said had been done, and not to his intention. Witnesses on both

sides testified to conversations with the testator wherein he mentioned that his property, excepting the home, was well invested in good productive securities. Witnesses for the contestants gave testimony that the testator subsequent to May 10, 1927 (the date of the disputed document), told them that Charlotte, his daughter, would receive an annual income of about $1,000 after he was gone. This statement, the contestants claim, coincides with provisions in the probated will and that it is inconsistent with provisions in the disputed document. The value of the estate, including the home, is approximate y $35,000. The interest of Mrs. Charlotte Ward, according to the terms of the probated will, is about $25,000. This is based on computing $6,500 to Mrs. Shaver and $3,000 to the children of Mrs. Ward. The interest at a savings bank would produce an income of $1,000 on that principal. Good investments should yield considerably more.

Under the terms of the disputed document, the interest of Charlotte Ward will amount to about $20,000 at the termination of the life use of Mrs. Shaver. If the testator spoke with reference to the value of the ultimate interest of Charlotte Ward, then this principal will easily yield $1,000 annual income, otherwise not. As no explanation was made by the testator as to the amount of return on his investments, and no details volunteered, the significance of this evidence is a matter for argument.

The proponent produced witnesses who testified to conversations and declarations by the testator during the summer of 1927 subsequent to May 10, 1927. These witnesses were a rector of the Episcopal church, once stationed at Camden, a physician who was an old friend of the testator, and a business man of Camden. The gist of their testimony is that Dr. Shaver told them that he had " arranged " or " had willed " the house or life use of the house to his wife. There is a slight variation in the testimony. One of these witnesses also testified that the testator explained that his wife, who was formerly a nurse, might desire to remodel the house and provide an operating room for possible patients.

The inference sought to be drawn from this proof is that the probated will devises the house to Charlotte Ward, while the disputed document provides for the life use of the house to Mrs. Shaver with the remainder to Charlotte's children.

Examination of cases where the issue was forgery shows that in some instances there exist features that proclaim the fraud independent of the writing. The water mark in the paper showing a date of manufacture years after the instrument bears date. Blanks showing them to have been printed after the date of the

paper. Papers fastened together with brass eyelets that had not been invented when the paper was dated.

The disputed document bears none of these badges of fraud. It is written on one sheet of unruled paper. In the upper left corner there are printed the words: " C. W. Shaver, M. D., Camden, N. Y." It is evidently one sheet of pad paper. The handwriting of Dr. Shaver is small and cramped but plain. The size of the letters and words are quite uniform. His style and formation of letters and words show wide variation. This is shown by intensive study of many exhibits under a powerful magnifying glass.

Miss Curtis, a witness who for many years has had exceptional opportunity to know the testator's handwriting, testified to this characteristic. Mr. Hamilton, a handwriting expert of forty years' experience and who is widely known in this field, testified that Dr. Shaver learned the Spencerian system, but that he had varied it to such an extent that his system and style were his own. It is this feature, I think, that is responsible for the difference of opinion about the genuineness of the disputed document, and has resulted in this contest.

Forgery cases that I have examined relate simply to a signature or at the most to a few words. The case under consideration is unique in that the disputed document contains 392 words comprising 1,252 letters with 32 numerals.

Mr. Hamilton testified that in his opinion Jean Clelland Shaver wrote the document and that it contains not one stroke of the pen by Dr. Shaver. The executor gave as his opinion that the disputed document was not written by Dr. Shaver. To the same effect is the testimony of a bank teller of the First Bank and Trust Company of Camden. A former employee of the same bank testified that he did not recognize the signature or any of the writing. These witnesses were familiar with the testator's signature as it appeared on checks drawn on the bank and with the standard signature on file there. They ventured no opinion as to whose handwriting the disputed document is.

A former official of a bank in Rome expressed the opinion that the disputed document is not in the handwriting of the testator. This witness never saw him write but his opinion is based on comparisons with standard signatures. This same method was used to qualify the witness by comparing the writing on the disputed document with standard writing of Jean Clelland Shaver to establish the authorship of the document. The replies of the witness on this phase of the case indicated that he was dubious and wavering. Mrs. Charlotte Ward, the daughter of the testator, expressed the opinion that the handwriting of the disputed document was not

her father's. She mentioned the capital " W " in testator's name as being unlike the genuine.

The proponents produced witnesses who were familiar with the testator's handwriting. A physician past seventy years of age who had long and intimate acquaintance with Dr. Shaver, a cousin who is a business man in Camden, and had many transactions with the testator, also a business associate who had seen him write many times. These men expressed the opinion that the disputed document is genuine and written by Dr. Shaver. Miss Julia H. Curtis was associated with Dr. Shaver as a registered nurse since 1919. Miss Curtis is a graduate of a State normal school and was a teacher before becoming a nurse. Her knowledge of the testator's handwriting is not confined merely to his signature. She pronounced the disputed document as genuine. With the exception of Miss Curtis and Mrs. Ward, the testator's daughter, the knowledge of witnesses produced on both sides related mainly to the signature of the testator. There was no occasion for any of them to study his handwriting and their several opinions were derived from the mental picture produced by frequently seeing his signature. The expert, Mr. Hamilton, is, of course, excluded from this group. This witness testified for the contestants and sought to prove two propositions, viz., that the disputed document was not written by Dr. Shaver but was in fact written by his widow, Jean Clelland Shaver. To demonstrate his theory Mrs. Shaver at the trial was suddenly requested to sit at a table and write from rapid dictation the entire contents of the disputed will, and the inscription on the envelope containing it. Her writing was photographed and placed opposite a photograph of the disputed document. Mr. Hamilton then endeavored to prove that the same person wrote both documents. According to his analysis the disputed document was written entirely from memory of the testator's handwriting. It was also written rapidly and shows practically no signs of patching or retouching. This witness also stated that Mrs. Shaver uses the Palmer method of penmanship with a free, easy wrist movement. The size of her letters is three times those of Dr. Shaver's, and each letter in the disputed document was successfully reduced to one-third the size of Mrs. Shaver's normal writing. According to this expert, the reduction in size of letters required a conscious effort on the part of the writer in making each of the 1,256 letters in the document. Coupled with this task of reduction was the necessity of simulating the handwriting of Dr. Shaver, all in one operation, rapidly and from memory.

This witness, with forty years' study and experience, made no

pretense himself of being able to perform this feat of penmanship. He was able to name but one person in the world, other than Mrs. Shaver, who in his opinion might accomplish this achievement. This man is Charles Wax, last known to the witness as a convict in a prison in the State of Washington. There are two others of equal skill whose names Mr. Hamilton did not recall. There is no evidence that Mrs. Shaver prior to this time did or could simulate the handwriting of another. To nominate this woman as one of a quartet of the world's most famous forgers requires slight comment. It is incredible and invades the zone of common sense. An experiment by any one to duplicate in part this performance, I think will convince the most skeptical of its impossibility. In this connection the thought occurs why should any one write nearly 400 words of a bogus document when all excepting the signature might be typewritten with impunity? If the motive were greed why should a substantial portion of the estate be left to others? Mr. Hamilton in comparing the two photographs referred to, found successful simulations of Dr. Shaver's writing of some words and letters in the disputed document. In others, he found a disguise of Mrs. Shaver's writing. In others he found a hybrid writing.

. Taking as a standard the signature of the testator to the probated will and comparing it to the signature on the disputed document, a considerable difference is noted. This is true with numerous checks.

If the disputed document contained no writing except the signature and using the probated will and contestant's selected checks as sole standards, a serious doubt might arise.

The defect in this process is that Dr. Shaver had a varying and shifting style of handwriting.

The fact that carries conviction and acquits the disputed document is that the testator with his wide range of variation, left many samples of his handwriting that correspond in minute details with the disputed document.

The normal limits of a memorandum preclude discussion or reference to all the words, letters and numerals that were compared. The capital " W " appearing in the name of the testator, received much attention at the trial. There is less variation in the formation of the " W " than in most of the other letters examined. This letter was usually made broad and squatty. It so appeared on the probated will and on numerous checks. It is written several times in the disputed document where it is less broad and more angular. Exhibits, however, show that this letter at times was written narrow and angular.

The capital " S " was another letter considerably discussed. Standards introduced by the contestants show a loop at the top.

The same letter shows no loop where it appears several times in the disputed document. The style of this letter was often varied as shown by numerous exhibits where the " S " conforms to the shape and style of that letter in the disputed document.

The capital " P " as it appears in the word " property " on the envelope mentioned, was claimed to be too large and high as compared with the genuine letter, and to nearly correspond with that letter written by Mrs. Shaver.

Necessarily there must be some resemblance in the same words and letters of different writers in order to be legible. Hands of human beings of the same race have a general similarity, but experts declare that no two fingerprints are alike.

The standards of this letter introduced by the contestants show a small, short letter written by the testator on checks and on the stubs. The natural impulse of a writer is to diminish the size of letters and words when written on a small surface. The converse is true when written on a large surface, like a legal size envelope, that contained the disputed document. Standing alone this common characteristic is not decisive. However, the standards in Mrs. Shaver's writing, while large, show a sort of bulging out on the up stroke leaving a much wider space from the down stroke than appears on the disputed envelope. The bottom of the letter " P " in the disputed envelope is more narrow and angular while her letter at the same point is rounded and wide. Exhibits, however, show this letter as it appears on the disputed envelope and prove that the testator did not at all times make the short and cramped letter.

Further examination shows that the testator wrote the small Greek " e " and the American " e." This habit runs true to form in the disputed document. The word " Charlotte " as it appears in the disputed document is identical with the same word written on a check stub introduced as an exhibit. The peculiar elevation of the letters " o " and " e " are particularly noticeable. The numerals also add their evidence. The numerals " 1," " 7 " and " 9 " show that Dr. Shaver made a slight backward curve at the bottom of the down stroke. This is evident on the disputed document and in numerous exhibits, including the album of photographed checks. The numeral " 2 " is shown to be elevated above the base line. This peculiarity is found in the disputed document and in many exhibits, including the photograph of a promissory note in the album. The testator made the top of the numeral " 5 " by a stroke of the pen leaving the mark detached from the other portion of the numeral and at an angle. Many exhibits show this, and it conforms to the formation of that numeral in the disputed document.

Comparisons of other letters and words might be made but no useful purpose would be served in so doing.

The evidence of several witnesses pertained to their observation as to whether Dr. Shaver was afflicted with tremor. The contestants assert that his writing shows indication of such tremor and that the disputed document is firmly written. There was disagreement among the witnesses.

It seems probable that failing health naturally affected the testator's nerves to a slight extent. His last illness was brief and there is a check in evidence written about two weeks before his death. I can see no lack of firmness in this writing although in other exhibits there is an occasional word that appears tremulous.

In the disputed document this infirmity manifests itself in the word " witness." There is lack of pen control in the word " of " in the first line of the disputed document, and it is also apparent in some of the other words.

For reasons that I have endeavored to make clear, I hold and decide that the instrument bearing date May 10, 1927, is genuine and that it was duly executed and published as and for the last will and testament of Charles W. Shaver and that he was at the time of sound and disposing mind and memory, and competent to make a valid will.

That by its terms all prior wills were revoked.

It follows that the decree of probate bearing date October 28, 1927, and letters testamentary issued thereon are set aside and revoked, and that the instrument bearing date May 10, 1927, is hereby admitted to probate.

Decreed accordingly.