■ In the Matter of the Estate of PALMA SYLVESTRI, Deceased. LOUISE PATTI, Appellant; ROCCO J. SYLVESTRI et al., Respondents.—In a probate proceeding, the petitioner appeals from a decree of the Surrogate's Court, Westchester County, dated August 5, 1975, which, *inter alia,* dismissed the petition for probate, upon a jury verdict. Decree affirmed, without costs or disbursements, on the opinion of Surrogate Brewster. Margett, Damiani and Rabin, JJ., concur; Cohalan, Acting P. J., dissents and votes to reverse the decree and remand the proceeding to the Surrogate's Court for a new trial, with the following memorandum, in which Titone, J., concurs: The fact situation in this case is akin to that of a prizefighter who got in a lucky and punishing punch on his opponent in the first round, and was able to carry through to a decision. At bar, when the proponent's counsel called Rocco Sylvestri, a contestant, to the stand, counsel committed a tactical blunder which proved, in the long run, to be the undoing of the proponent's case. Counsel's thought was that Rocco would be shown a 1966 deed, wherein he was named as grantee and his mother was named as grantor, and that his recognition of her signature would prove it to be a foolproof specimen—or exemplar—signature, from which the handwriting expert of the proponent could work. The plan backfired. Rocco looked at the signature and stated that it was not his mother's signature. Under CPLR 4519 Rocco, as an interested party, could not have made such a statement if called by his own attorney, without fear of a mistrial. Called by the proponent, he could. No foundation was laid for his testimony and, obviously, he is not an expert, but the impact of the testimony on the jury must have been tremendous. As a direct result of the contretemps, the verdict of the jury has stigmatized

three men of prior unblemished records, and has cast upon them the implication of perjury and other criminal acts by their testimony in this contested probate proceeding. The three are all attorneys at law, each admitted to the Bar for upwards of 25 years. At the request of the testatrix, relayed through her son-in-law, Clement Patti, the attorneys met at Patti's house on April 24, 1972 to act as subscribing witnesses to the testatrix' last will and testament. She was present. Two of the men were friends and were friends of comparatively long standing of the testatrix and her son-in-law. The third, the draftsman of the will, had a nodding acquaintance with one of the other witnesses, but had never met the third until the appointed evening. This fact assumes great importance when it is realized that the implication advanced to the jury—and presumably inferred by its members —is that the three were acting in concert in a conspiracy with the son-in-law. The latter, himself an attorney, is the husband of the residuary legatee, the executrix named in the will. He and she lived next door to the testatrix and, in the latter's declining years (she died at age 87 in December, 1972), the daughter attended to her mother's every material want. The other six children—with one exception—saw their mother but seldom, and had little, if anything, to do with her. The one exception stopped by to see her occasionally. He is not a contestant. With minor discrepancies—explained by the fact that they were testifying three years after the event—the three witnesses testified to the due execution of the will in their presence. Their testimony was not shaken in any significant detail. Tactical errors committed by the trial counsel for the proponent, particularly his ploy of putting Rocco Sylvestri, a contestant, on the stand—and counsel's hearing infirmity —apparently impelled the jury to its astounding verdict. That it was truly against the weight of the credible evidence is indicated by the unshaken testimony of the subscribing witnesses. There is a principle of law—applied to parties as witnesses, but seemingly relevant at bar—that: "Where * * * the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and it is not opposed to the probabilities; nor, in its nature, surprising, or suspicious, there is no reason for denying to it conclusiveness" *(Hull v Littauer,* 162 NY 569, 572). As noted, the statements of the three witnesses were not disturbed and, presumably, if Rocco Sylvestri had not been called by the proponent, no shadow of doubt could have dimmed their testimony. Nor is it surprising, or suspicious, that the testatrix—an illiterate in both the Italian and English languages—in a moment of exaggeration, said that she wanted 12 lawyers as witnesses. Her son Salvatore, one of the contestants at bar, had also contested the will of Croce Sylvestri, his predeceased father, but had failed to break it, and his mother wanted to prevent a possible recurrence. That her objective failed can be explained only by the bizarre direction taken as a result of the battle between the contending handwriting experts and, as noted above, the faulty tactics of trial counsel for the proponent. The sole issue given to the jury was due execution of the will. Therefore, the crux of the trial was the disputed signature of the testatrix. She seldom had occasion to sign her name to anything. Thus, as testified to by the subscribing witnesses, she practiced in their presence by scribbling her signature three or four times on a piece of paper extraneous to the will. Bearing in mind that she was 87 years of age, that she had a deformed little finger (pinky) on her right hand (she was right handed), and that she was forced to hold her pen between the index and middle fingers in order to write, it is not at all odd that her various efforts at signature writing over the years varied widely. In my opinion the Surrogate improvidently exercised his

discretion with respect to a document that the proponent's trial counsel, rather belatedly, attempted to have received in evidence. Two points militated in favor of its reception. It was a power of attorney executed by the testatrix in July, 1972, the signature on which bore a striking resemblance to the signature on the will; it also bore a great similarity to her admitted signature on a safe deposit signature card signed in the presence of a bank clerk, who had already testified to that effect. The reason for this offer was to show that it had been solicited by the bank clerk herself. She wanted such an instrument to correct an error she had made in allowing Croce Sylvestri to sign a safe deposit box surrender card. If admitted, the power of attorney would have represented a signature similar to that on the will and on the 1966 deed, and would have established their authenticity. In the interest of justice, the court should have permitted proponent to open her case to present the exhibit. Two of the three subscribing witnesses were requested to act as such because they had been witnesses to Palma Sylvestri's prior will, executed in 1966, and to a codicil to that will, executed in 1967. It was only logical that they were asked to act in that capacity by reason of their prior experience. Contestants attempted to establish—and apparently convinced the jury—that the three lawyers conspired with Clement Patti, the daughter's husband, to pull the wool over the eyes of the court and jury. Yet they had no conceivable reason for such an action. They were not named in the will, they stood to gain nothing from its admission to probate and there is no evidence that Patti was going to reward them for their alleged perfidy. The draftsman did not even get paid for drawing the will and the attorneys were at the daughter's house, next door to that of the testatrix, for the sole purpose of acting as witnesses to her will. They were not closeted in dark divan—or with cloak and dagger—in a conspiracy to defraud the other children in the family, and they had no earthly reason to expose themselves to criminal action and, at the very least, the strong probability of facing disciplinary charges. It passes understanding to believe otherwise. Until after the turn of the century, the field of handwriting experts was held in somewhat low esteem by our Court of Appeals, as evidenced by the expression in *Hoag v Wright* (174 NY 36, 42): "The opinions of experts upon handwriting, who testify from comparison only, are regarded by the courts as of uncertain value, because in so many cases where such evidence is received witnesses of equal honesty, intelligence and experience reach conclusions not only diametrically opposite, but always in favor of the party who called them." As the old saw has it: "Whose bread I eat, his song I sing." Since that rather cynical observation was made by our highest court in *Hoag,* examiners of questioned documents, as handwriting experts prefer to be called, have attained more respectable standing in the courtroom. The obvious weight given to the testimony of Albert S. Osborn in the Lindbergh-Hauptmann trial is a case in point. At bar, however, the quality of such testimony was called into serious question. In the face of the positive testimony of a bank clerk that Croce and not Palma Sylvestri had signed a certain item, the proponent's expert was adamant in his position that the decedent had affixed the signature. Even to ask him about the signature after the bank clerk testified was a tactical error by the proponent. More of a contretemps arose when the expert for the contestants testified, and we must hark back to the testimony of Rocco Sylvestri to show why. The jury attached undue credence to the self-proclaimed expertise of Rocco Sylvestri. He was an interested party as an objectant to the will. He stated, based upon one quick look at the April, 1966 deed wherein he was grantee, that the signature of the grantor was not that of his mother. Since

Clement Patti's signature appears on the deed as the notary, the jury inferred that he had been guilty of some irregularity in that transaction as well. The question naturally arises: Why would Patti—as it is implied—forge, or cause to be forged, his mother-in-law's signature to a deed of gift to Rocco when she herself intended that Rocco have the property? Does it square with reason to believe that in 1966 Patti was already planning to forge her will in 1972, and that at that time he would fortuitously obtain the dutiful acquiescence of three mature and experienced lawyers to aid and abet him in his criminality? The question itself invites the obvious negative answer. The 1966 deed should have been considered as a true specimen signature of Palma Sylvestri and, had it been, it would have gone far to prove the authenticity of the signature on the will. As to the deed, the testimony of the handwriting expert for the contestants makes interesting reading. Until he appeared at the trial, the expert had never seen the 1966 deed. Yet, on a superficial examination almost as cursory as that of Rocco, he said: "Well, I have not spent a great deal of time on it. However, the preliminary examination comparison indicates to me that the signature on this particular indenture dated April 26 of 1966 of Palma Sylvestri, this particular signature is quite similar to the signature of Palma Sylvestri on the Will in question dated April of 1972, and also that this particular signature on this document that I hold in my hand (indicating) dated April 26 of 1966 is not similar and does not correspond to what I referred to previously as the known writings of Palma Sylvestri." He was already wedded to the conclusion that the will was a forgery and, thus, reasoning backwards, the deed was a forgery too. A probate proceeding strikingly similar to that at bar in its factual circumstances is *Matter of Shaver* (133 Misc 112, affd 227 App Div 646). There the widow of the deceased belatedly found and filed with the Surrogate's Court a purported will of her husband, witnessed by two women of unquestioned integrity in the community. A prior will had already been admitted to probate at the time of the later discovery. After an exhaustive review of the facts in a nonjury contested probate proceeding, the Surrogate wrote (pp 118–119): "The contestants contend that the disputed document is manufactured and a fraud in its entirety. They advance the theory that the two attesting witnesses and the widow were indignant and resentful over what they considered an injustice to the widow and that this feeling gave birth to the idea of constructing a new will with provisions more favorable to Mrs. Shaver. Applying to this theory the undisputed evidence alone, we have here three women, one seventy-three years of age, and the other two in middle life. Their residence in Camden extended over many years. They have the stamp of respectability and good social standing in their community. This alleged plot was no light and trivial matter. It meant the commission of serious crimes, including conspiracy, forgery and perjury. The question confronts us whether these women gauged according to accepted standards of human conduct would suddenly become criminals? Was the financial gain a sufficient motive for Mrs. Shaver? Was friendship for her so intense and compelling that Mrs. Warne and Mrs. Clark should ignore their natural instincts for right living and enter the zone of danger and crime? Good character of a defendant on trial charged with crime is a factor to be considered by a jury. The good character of these three women too must have its proper consideration and weight here. The appearance and manner of a witness while testifying in court have their bearing in deciding the truth or falsity of the testimony. These witnesses told their story in a simple and natural way. Cross-examination failed to fluster or confuse them. A story with no basis of truth and

one of pure invention is pregnant with danger and pitfalls." If we substitute the three lawyers for the two ladies in the *Shaver* proceeding in their capacity as subscribing witnesses, we should arrive at the same result. The proponent, in her brief, maintains that the decree of the Surrogate's Court should be reversed and the matter remitted to that court with directions to admit the disputed will to probate. Even in "Point One" of her brief the claim is made that the motion for a directed verdict should have been granted. As I see it, however, based upon the facts and the law, and in the interest of justice, the decree should be reversed and the proceeding remanded to the Surrogate's Court for a new trial on the sole question of due execution of the will.